[No. 37.   Third Appellate District.—July 25, 1905.]

# W. & P. NICHOLLS, Respondent, v. G. W. MAPES, Appellant.

CONVERSION OF CATTLE—AGENCY—TITLE OF PRINCIPAL—ATTACHMENT AND SALE IN HANDS OF AGENT.—In an action for the conversion of cattle by the defendant, where it appears from the evidence that plaintiff employed an agent to buy and sell cattle, whose compensation out of the profits was to be applied to pay the agent's debt to the plaintiff, the plaintiff's title is established, and an attachment of the cattle in the hands of the agent, and a sale thereof to the defendant as the agent's property, for a debt of the agent to the defendant, established a conversion, entitling the plaintiff to recover.

ID.—PURCHASE WITHOUT DISCLOSING PRINCIPAL.—The fact that the agent purchased the cattle in controversy from a third party without disclosing the principal, the purchase having been made out of the funds of the principal, cannot affect the title of the principal against third parties.

ID.—IMPROPER DAMAGES FOR PURSUIT OF PROPERTY—ATTORNEY'S FEES —COST OF DEPOSITIONS.—Attorney's fees are not recoverable in an action for conversion, as damages incurred in the pursuit of the property under section 3336 of the Civil Code, nor as costs in the action. The cost of taking depositions forms no part of the damage, and should be determined in the cost-bill.

APPEAL from a judgment of the Superior Court of Lassen County.   F. A. Kelley, Judge.

The facts are stated in the opinion of the court.

Garoutte & Goodwin, for Appellant.

N. J. Barry, for Respondent.

CHIPMAN, P. J.—This is an action to recover the value of certain six head of cows alleged to have been wrongfully converted by defendant on April 26, 1901, at the county of Lassen. The cause was tried by the court without a jury and plaintiff had judgment for the value of the cattle with interest from the date of conversion, and for twenty-five dollars "as compensation for the time and money expended by plaintiff in the pursuit of the property." Defendant appeals from the judgment on bill of exceptions.

The court found as facts: That plaintiff is a copartnership, doing business as bankers in the town of Dutch Flat, Placer County; that on the date above named "plaintiff was the owner of, and entitled to the possession of the six cows described in the complaint"; and said defendant wrongfully converted them to his own use; that plaintiff has expended twenty-five dollars in pursuit of said property.

1. Appellant challenges the sufficiency of the evidence to support the finding that plaintiff was the owner of the property, and thus presents the principal question in the case. It appears that the cattle in question were in the possession of one E. H. Hamlin, and were attached at the suit of the present defendant against said Hamlin, and were purchased at execution sale by said Mapes, who now claims title through such purchase. Plaintiff claims that Hamlin was acting as its agent when he purchased the cattle, and hence its claim of ownership. Hamlin testified: "I was working for W. & P. Nicholls under a written contract." Again he testified: "Whatever purchase I made of those cattle was made in accordance with this contract; supposed to be." We think there is sufficient evidence to show that this contract was in force when the cattle were purchased by Hamlin, and the question of ownership must be determined from an examination of its terms and from such surrounding circumstances as may properly be considered in arriving at the intention of the parties to it. It is dated May 16, 1900, and reads as follows:

"This agreement, made this 16th day of May, nineteen hundred, between W. & P. Nicholls, parties of the first part, and E. H. Hamlin, Jr., party of the second part, is as follows:

"Whereas, the parties of the first part have advanced to the party of the second part, divers sums of money from time to time to purchase cattle and pay the expenses of keeping the same, and for other purposes, and thereby the party of the second part has become indebted to the parties of the first part, and by a statement this day made, the party of the second part should have on hand 186 head of cattle;

"Now, for the purpose of paying said indebtedness, the party of the second part does hereby assign, sell, and transfer to the parties of the first part all accounts and demands of every kind which may be due him at this date, and also all

live stock which he may now own, or may have the right to the possession of, or may have pledged for debt, or may have contracted to buy.

"The party of the second part hereby agrees and promises to deliver to the parties of the first part, 186 head of cattle on or before January 1, 1901, and the same when delivered, shall be the property of the parties of the first part, and the proceeds arising from the sale of the same shall be paid to the parties of the first part and credited to the accounts of the party of the second part, and applied upon the said indebtedness.

"And the parties of the first part shall have the right to collect all book accounts now due the said party of the second part, and the same when collected, shall be applied upon said indebtedness.

"And for the purpose of paying said indebtedness, the party of the second part agrees to devote his undivided time, skill and labor to the buying and selling of cattle, and for that purpose, the parties of the first part will advance to him from time to time, such sums as may seem to them reasonable for the purpose of buying stock and paying expenses connected with the keeping and selling of the same.

"The parties of the first part hereby employ the party of the second part to act as their agent and employee, and not otherwise, in the buying and selling of cattle, and agree to pay to him for said services, the sum of fifty dollars ($50) per month, and his reasonable personal expenses; such employment to be continued for such length of time as may be agreeable to the parties of the first part.

"A statement shall be kept of all accounts from this date, and for that purpose, a new account shall be opened between the parties hereto, and the amount of indebtedness existing at this date shall be charged on said account to the second party, and the amount realized from the sale of said 186 head of stock, and the collection of book accounts now due him, shall be charged against the same, and if there shall remain a balance due the said parties of the first part, all the profits arising from the conduct of said business from this time forward, shall be applied upon the payment of the amount due, and interest thereon at nine per cent per annum, payable semiannually, and if not so paid, to be added to the principal, and

bear a like rate of interest, until the same is fully paid, and when the same is fully paid, this contract shall cease.

"All stock shall be purchased and sold in the name of the parties of the first part, and the expenses of caring for, purchasing, driving, transporting and selling of said stock, and the personal expenses of said second party, and his said wages of fifty dollars ($50) per month, and interest at the rate of nine per cent per annum, payable June 30th and December 31st of each year; and if not so paid, to be added to the principal and bear a like rate of interest, on all advances, shall be first deducted from the proceeds of sales, and the balance, if any, shall be applied upon the said indebtedness.

"E. H. Hamlin, Jr.

"W. & P. Nicholls."

It appears that Hamlin had been engaged in the business of buying cattle in Lassen County, and became indebted to plaintiff for advances of money. Hamlin had some cattle, and the contract recites that he "should have on hand 186 head." It was "for the purpose of paying" his "indebtedness" to plaintiff that the contract was entered into. Hamlin transferred to plaintiff all his interest in the cattle he then (May 16, 1900) owned and all accounts due him at that time, and undertook to deliver these one hundred and eighty-six head of cattle to plaintiff on or before January 1, 1901, to be plaintiff's property when delivered, but the proceeds of their sale and of the book accounts were to be applied to Hamlin's indebtedness existing at that time. It may be inferred from the contract as well as from the testimony that these cattle and the book accounts were not deemed sufficient to pay the indebtedness of Hamlin to plaintiff, and it was therefore further agreed that Hamlin should continue the purchase of cattle, devoting his time exclusively to that business, and "for that purpose the parties of the first part will advance to him from time to time such sums as may to them seem reasonable for the purpose of buying stock . . . and selling of the same." And to fix the relation the parties were to sustain to each other in this future business, the contract next provides: "The parties of the first part hereby employ the party of the second part to act as their agent and employee, and not otherwise, in the buying and selling of cattle, and agree to pay him for his services, the sum of fifty dollars

per month, and his reasonable personal expenses," the "employment to be continued" as long as "agreeable to the parties," except that it was provided that upon plaintiff being fully paid "this contract shall cease." It was further expressly provided that "all stock shall be purchased and sold in the name of the parties of the first part," and "the expenses of caring for, transporting and selling of said stock, and the personal expenses of second party, and his said wages of fifty dollars per month, and interest . . . shall be first deducted from the proceeds of sales, and the balance, if any, shall be applied upon the said indebtedness." The evidence was that the six head of cattle were purchased by Hamlin, and constituted no part of the one hundred and eighty-six head; that he paid for them by check upon plaintiff; that at that time he was still indebted to plaintiff. Both of the members of the plaintiff copartnership testified that they paid for and were the owners of the six head of cattle in dispute, and that Hamlin was in its employment on wages. Hamlin testified that when he purchased these six head of cattle he said nothing to the vendor as to whom they were purchased for; that he sometimes bought cattle and sold them to butchers, stating that they belonged to plaintiff, and that he collected the money for plaintiff; at other times he sold to other butchers and collected the money without informing them who owned the cattle, and all this money was used in the business; that at times he used some of his own money for expenses which he charged to plaintiff, and that plaintiff's books show the number of cattle purchased by him under this employment.

Defendant urges several considerations as showing that the court should have found from the evidence that the cattle belong to him. It is said that they were attached in Hamlin's possession, which constituted *prima facie* evidence of title; that plaintiff failed to explain this possession because, as is claimed, plaintiff failed to show that the contract above referred to was in force when the cattle were purchased. It is true that the cattle in question were not purchased until after January 1, 1901, by which time Hamlin had agreed to turn over the one hundred and eighty-six head. But it appeared that the business was continued after that date. Whether or not these one hundred and eighty-six head were delivered to plaintiff does not appear, but it does appear that Hamlin was

I Cal. App.—22

still in plaintiff's debt and his checks were being honored under his employment. Hamlin's possession was explained by the contract and by the testimony. But conceding this, appellant contends that it is not possible "to get out of the contract a construction which makes plaintiff the owner of the cattle." Considering the circumstances which to appellant's mind make this construction seem impossible, we see no particular significance in the fact that Hamlin did not explain to his vendor of the six head of cattle that he was buying them for plaintiff. If the vendor were the attaching creditor he might urge the circumstances attending the sale as showing that Hamlin was the owner without looking to Hamlin's principal, which latter he might also do. (Civ. Code, sec. 2336.) But the vendor was paid by check on plaintiff, and Hamlin was not called upon to make any explanations, and plaintiff's rights cannot suffer because Hamlin did not disclose his principal. Nor do we see that the fact that plaintiff is to have interest for the use of its money, and Hamlin to have all the profits applied to paying his indebtedness to plaintiff, is inconsistent with the idea of plaintiff's ownership of the cattle. There were no profits in excess of the indebtedness, and we need not concern ourselves with the question of their disposition had there been any such, for the contract provided that as soon as the indebtedness was paid the contract was to terminate.

It is contended that the contract was one for plaintiff's security, and that the cattle could not become a security until delivered to plaintiff. This may be true of the one hundred and eighty-six head, for the contract provided that as to them they were to belong to plaintiff when delivered, their proceeds when sold to be applied to Hamlin's indebtedness. But as to the purchase of cattle in the future it was expressly provided that Hamlin should act as plaintiff's agent, should use plaintiff's money in making purchases for plaintiff, and if there were any profits above the money so laid out and interest thereon it was to be applied to Hamlin's indebtedness existing at the time the contract was made, and not to any new indebtedness, for none was to be created; and Hamlin's only obligations were such as arose out of the relation of principal and agent. It seems to us that the transaction was the not unusual arrangement by which the principal employs an agent to purchase and sell goods for him, the agent to be compen-

sated out of the profits. In the present case the compensation or profits, if any, were to be applied to pay the agent's debt to the principal. It is quite true that the actual relation of the parties to each other must be judged from a fair construction of the entire contract and all the circumstances, and that the court is not bound to assume that there was the relation of principal and agent from the mere fact that the parties so described themselves. (*Stockton Sav. and L. Soc.* v. *Purvis,* 112 Cal. 236, [53 Am. St. Rep. 210, 44 Pac. 561].) Looking to all the provisions of the contract and the attending circumstances, we think it clear that the cattle in question were purchased by Hamlin as the agent of plaintiff, and that plaintiff was the owner at the time they were attached and sold to defendant. It does not appear upon what indebtedness the cattle were attached nor under what circumstances nor when the indebtedness accrued. There is no evidence that defendant was in any way deceived by Hamlin in contracting the indebtedness for which the cattle were attached, nor that it had any connection with Hamlin's actual or ostensible relation with plaintiff, either in the purchase of cattle or otherwise; nor was there any concealment of the relation sustained by Hamlin and plaintiff, for the contract was duly recorded in the county where Hamlin bought the cattle, and on occasions he stated that he was buying for plaintiff, and it does not appear that he ever purposely concealed the fact of his agency. An agent is one who represents another, called the principal, in dealing with third persons (Civ. Code, sec. 2295), and may be authorized to do any acts which his principal might do. (Civ. Code, sec. 2304.) In *Loomis* v. *Barker,* 69 Ill. 360, the proof was, that certain horses belonged to appellee, and that at the time they were levied upon they were in the possession of one Cook as the general agent of appellee, who was authorized to sell them for appellee and was required to account to him for the proceeds of sale. The court said: "This did not invest Cook with any title to the horses so as to render them liable to be seized on execution or attached against him and sold for the payment of his debts." The case of *Stockton Sav. and L. Soc.* v. *Purvis,* 112 Cal. 236, [53 Am. St. Rep. 210, 44 Pac. 561], relied on by appellant, is not, in its facts, sufficiently similar to the present case to make the principles there enunciated applicable. In that case the

plaintiff was the owner of land, and made a secret oral agreement with his tenant that the tenant should pay a cash rental for the land, and that the title to the crops grown on the land should remain in plaintiff and when harvested should be delivered to the nearest warehouse and stored in the name of plaintiff, and from the sale of the crops plaintiff should receive as rent the sum stipulated, and the overplus, if any, should go to the tenant. The growing crop was attached by the creditor of the tenant and the action was against the sheriff by plaintiff. The court held that in effect the contract was "an attempt to obtain the advantages of a chattel mortgage without complying with the provisions of the statute upon that subject." In the case here the purpose was not to secure the money advanced to purchase cattle; it was to make an arrangement or investment whereby Hamlin could pay a debt he owed plaintiff; it was to furnish means whereby the result of his labor alone would discharge this debt; if he so managed by his skill and labor, in the use of plaintiff's money, as to yield a profit in the business this profit should be his reward, and when it was sufficient to pay his debt the agency was to cease. But in the cattle he was to purchase he had no interest whatever. The case seems to us quite different from the case above cited.

2. It is further contended that the findings and judgment for twenty-five dollars as compensation for the pursuit of the property are unsupported by the evidence. The only testimony on the point was that of John Nicholls (one of the members of plaintiff), who testified that plaintiff paid at different times "consultation fees" to its attorney at Auburn twenty-five dollars; that he "made three trips to Auburn in the matter for which a legitimate proportion" of his "expense there is $5.00"; that he paid ten dollars "in expenses of Charles Tuttle in coming to Dutch Flat to take the depositions"; that he paid "about $5.00 notary's fees, making in all the sum of fifty dollars." Attorney's fees are not recoverable as damages under section 3336 of the Civil Code, nor as costs in the action. (*Hays* v. *Winsor,* 130 Cal. 230, [62 Pac. 395].) Aside from payments for attorney's fees the evidence does not show for what purpose the witness made a trip to Auburn, though probably to consult his attorney; nor does it appear for what he paid the notary; it may have been for taking the deposi-

tions.   The payment to Charles Tuttle is not sufficiently explained to enable us to judge in what capacity he served in taking the depositions.   The expenditure for depositions, however, should be determined in the cost-bill, and forms no part of the damages as such.

The judgment is modified by striking out the item of twenty-five dollars as compensation for the pursuit of the property, and otherwise the judgment is affirmed.

McLaughlin, J., and Buckles, J., concurred.