[L. A. No. 18907. In Bank. Apr. 17, 1945.]

BETTY RUTH L. VINER et al., Respondents, v. MARY UNTRECHT, Appellant.

Arthur E. Briggs and J. B. Mandel for Appellant.

S. L. Kurland and W. L. Pollard for Respondents.

CARTER, J.—We have examined the record in this case and adopt the decision of the District Court of Appeal of the Second Appellate District, Division Two, prepared by Mr. Presiding Justice Moore, with the omissions, alterations and additions hereinafter appearing:

"This action was brought to enforce a resulting trust. All of the material allegations of the complaint were found to be true and those of the cross-complaint substantially contrary to the complaint were found to be untrue. Also, the court found that defendant's maintenance of her claims of ownership of the realty and of her claims of lien upon certain movables of plaintiffs was in bad faith by reason of which plaintiffs were awarded . . . attorney's fees in the sum of $1,000. From the ensuing judgment defendant has brought this appeal upon seven grounds [most of] which may be summed up' in one phrase: Insufficiency of the evidence to support the findings and the judgment.

"Prior to November 15, 1940, plaintiff, Betty Ruth L. Viner, herein at times referred to as Ruth, was president of the Business Women's Association, a nonprofit California corporation. She and her corporation were associated with the Western States University, also a nonprofit California corporation. The two corporations having interests in the several properties involved in this action joined with Mrs. Viner as plaintiffs to establish their respective claims against a common adversary. Inasmuch as the right of each of the plaintiffs as against one another is immaterial to a decision, no effort will be made to keep distinct their respective interests insofar as they relate to defendant.

"Prior to November 1, 1940, Ruth had become associated with defendant Mary Untrecht. About that date, having investigated and negotiated for the acquisition of a house on behalf of the association, Ruth decided to undertake the purchase of a fourteen-room residence, herein referred to as 'La Brea house,' for the sum of $6,300, on terms, 10 per cent payable in cash, the balance in deferred payments. In order to effect such purchase, Ruth, on behalf of the association, agreed with Mary that if the latter would lend the association as much as $1,500 in order to consummate the transaction, to make certain improvements, to buy certain furnishings and to pay the accrued taxes and assessments, she should be repaid her advances with interest at 7 per cent per annum compounded; receive instructions in comptometry and bookkeeping; and have the use of a residential room free of charge. As security for the repayment of her loan, it was agreed that the title to the property should be vested in defendant. Arrangements for the purchase were concluded on January 3, 1941, when Mary deposited in the escrow the sum of $715, and she was named grantee in the conveyance of La Brea house. The association installed its furniture and furnishings, leased to Mrs. Viner certain residential rooms, which lease was ratified by [defendant], and, pursuant to the loan agreement had Mary occupy the room she had selected for herself. Ruth moved her furniture into the house, and both women continued to reside there until the repudiation of the loan contract by Mary. In the following month [defendant] advanced an additional $200 to the association and thereafter made other payments on account of the property.

"Simultaneously with the foregoing events the association leased certain space in the building to the University for the storage of its 165 law books, comptometer and other equipment, and this tenant agreed to carry out the association's contract with [defendant] by giving her the promised technical training. For fifteen months Mary continued to reside in the house and to receive instructions from the University which tuition was of the reasonable value of $300. After the occupancy of the house by the two women Ruth made practically all of the installment payments on the purchase price, paid the taxes and assessments, the utilities and expense of operation. This continued until January 3, 1942, when the asso-

ciation extended Ruth's lease for another year in considera-
tion of her continuing the same payments. This she did until
July 15, 1942.

"On July 4, 1942, [defendant] informed the association
that she was the owner, demanded possession of the property;
declared the association had no interest therein, and repudi-
ated all agreements theretofore made with Ruth. The asso-
ciation requested a statement of its indebtedness on account
of moneys advanced by Mary but that lady denied the exist-
ence of any such indebtedness. Following her oral and writ-
ten demands for possession of the realty, Mary asserted a
lodging-house lien upon the furniture and furnishings of
Ruth and of the association and on September 10th she posted
notice of sale of such effects pursuant to section 1861, Civil
Code, for the purpose of satisfying her demand for moneys
advanced in the sum of $3,142. The total of all moneys ad-
vanced by Mary in connection with the purchase and improve-
ment of the property was $1,679.62. Besides her own occu-
pancy, after her repudiation, Mary received net rentals as in-
come from the house [in the amount of] $623.55. The Univer-
sity owns the movables it had placed in the house under its
lease from the association. Although Mary had no interest in
them she took them away and held them without any claim of
right. Their value is $3,000. That corporation and Ruth were
both required to employ counsel to effect a recovery and the
reasonable value of such service to each of them is the sum
of $500.

"The foregoing facts having been found to be true the [trial
court concluded as follows]:

"(1) At all times the association was the equitable owner
of La Brea house. (2) Defendant held title for the associa-
tion, subject to her lien for advances; but (3) she had no right
to the possession of the property to the exclusion of [plain-
tiffs]. (4) By virtue of their leases, Ruth and the University
were entitled to occupy certain rooms which they entered as
tenants of the association and occupied February 1, 1941;
(5) neither was Mary a boarding-house keeper, nor was Ruth
her guest, but on the contrary, (6) she was herself a mere
lodger in the house. (7) She had no lien upon, claim to, or
legal interest in, the law books and bookkeeping machines
taken by her from the University or to any of the chattels
claimed by Ruth, therefore Mary should pay to Ruth and the
University the $1,000 counsel fees and. . . . (9) The associa-

tion is entitled to all moneys heretofore collected as rentals on the La Brea house and to an accounting of all moneys paid her as rentals therefor after July 4, 1942, besides the $623.55 she accounted for prior to judgment.

██ "It is fundamental that where a judgment is attacked on the ground that it is not supported, the power of the appellate court ends when it shall once have determined that there is substantial evidence which will support the conclusions of the trial court." (See *Stromerson* v. *Averill*, 22 Cal. 2d 808 [141 P.2d 732] ; *Watson* v. *Poore*, 18 Cal.2d 302 [115 P. 2d 478].) ██ And that rule is applicable where the action is one to enforce a resulting trust. Whether the evidence to prove the existence of the trust is clear, satisfactory and convincing "is primarily a question for the trial court to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal." (*Stromerson* v. *Averill, supra,* at p. 815. See, also, *Beeler* v. *American Trust Co.,* 24 Cal.2d 1 [147 P.2d 583].) Likewise, in such cases the credibility and weight of the evidence are exclusively for the trial court. (*Watson* v. *Poore, supra; Stromerson* v. *Averill, supra.*)

██ "The proof found to support the findings and judgment consists of two classes, to wit: (1) the declarations and affidavits of [defendant] and (2) the testimony of [plaintiffs] and their witnesses. Defendant testified that she purchased the La Brea home for herself and that the association was never mentioned in reference to the property. However, on October 29, 1940, she executed an affidavit to be filed in her divorce action in the superior court in which she averred that her sole possession was a $200 interest in a life insurance policy. On June 19, 1941, six months after taking title to the La Brea property she filed her verified amended complaint in the same action alleging that she was indigent. . . . In the verified divorce pleading she alleged that she was so ill from October, 1940, to June, 1941, that she was unable to do any work. In the present action she alleged under oath (1) that during the same period she acted as secretary, office attendant, and instructor for the association in its downtown office and that such services were worth $1,540; and (2) that during the same period she was acting as housekeeper for [plaintiffs] and did all of the work for the roomers and for [plaintiffs] in the upkeep of the fourteen-room house with its six bed-

rooms, and that such services were reasonably worth $1,690.

"The testimony of Mrs. Viner established that she located the La Brea house as a desirable property and that Mary accompanied her to visit the premises. They had many meetings at which the house was shown to certain members of the association and Mary finally agreed to lend to the association funds not to exceed $1,500 in order to complete the purchase and repairs. Ruth conducted all negotiations; dictated all letters for Mary's signature and told the agent of the grantor that the title would be taken in the name of [defendant] in order to comply with the requirements of the bank which declined to convey to an eleemosynary corporation. Mary was present at all of the conferences had with the seller or its agent; was present at the time the escrow was opened; advanced $715 for the down payment and other outlays and later gave Ruth $200 as a part of the sums she had promised to advance. At the time the escrow was opened Mary stated to her that she hesitated to take title to the property in her own name by reason of the pendency of her divorce action.

"The witness Ware, licensed real estate broker, testified that, in his presence at about the time the escrow was opened, [defendant] stated that they could not buy the property under the name of the association on account of its credit standing and that it was taken by her in trust for the association to be conveyed to it at the proper time. The witness Kohan, sister of Ruth, established that in the summer of 1942 Mary told her that the property belonged to the association; that she desired to collect the moneys she had loaned to make the purchase; that it could be sold at a profit if she and Ruth could share in it; that if it were not sold 'she would use any means possible to make her sell it so she could get her loan therefrom.' One Shoup made a contract for the painting of the house with Mrs. Viner and Mrs. Snyder, president and secretary of the association. He testified that he never discussed the painting with [defendant] during the several weeks he was there employed. . . . When defendant gave notice of her repudiation her language was that 'all agreements between you and Mrs. Untrecht are hereby terminated and cancelled.' From such language of her counsel, in the light of other proof, it is a reasonable inference that defendant acknowledged that she had made a contract with Mrs. Viner on terms advantageous to the latter. . . ."

From the foregoing it is apparent that we have an agreement between plaintiffs and defendant under which the latter agreed to lend money to the former for the purchase of real property, the title to which was to be taken in the name of defendant who was to hold it in trust for plaintiffs. Thereafter, and pursuant to that agreement, the loan was made by defendant to plaintiffs and as a part of the same transaction the money representing the loan was paid by defendant to the vendor of the property rather than to plaintiffs, and defendant became obligated to make the balance of the payments on the property. The property was accordingly conveyed to defendant. The rules of law applicable to those facts are clear. ■ In the ordinary case a resulting trust arises in favor of the payor of the purchase price of the property where the purchase price is paid by one person and the title is taken in the name of another (Civ. Code, § 853; 25 Cal.Jur. 178). ■ It is not always necessary that the payment of the purchase price be made by the claimant of the beneficial interest. It may be made by the transferee when it constitutes a loan from the transferee to the claimant. (*Watson v. Poore, supra; Millard v. Hathaway*, 27 Cal. 119; *Walton v. Karnes*, 67 Cal. 255 [7 P. 676]; *Ward v. Matthews*, 73 Cal. 13 [14 P. 604]; *Hellman v. Messmer*, 75 Cal. 166 [16 P. 766]; *White v. Costigan*, 138 Cal. 564 [72 P.178]; *Breitenbucher v. Oppenheim*, 160 Cal. 98 [116 P. 55]; *Brown v. Spencer*, 163 Cal. 589 [126 P. 493]; *O'Rourke v. Skellenger*, 169 Cal. 270 [146 P. 633]; *Webb v. Vercoe*, 201 Cal. 754 [258 P. 1099, 54 A.L.R. 1200]; *Schumacher v. Langford*, 20 Cal.App. 61 [127 P. 1057]; *Crozier v. Soquel*, 101 Cal.App. 402 [281 P. 698]; *Penziner v. West American Finance Co.*, 133 Cal.App. 578 [24 P.2d 501]; see *Stromerson v. Averill, supra; Hidden v. Jordan*, 21 Cal. 92; *Sandfoss v. Jones*, 35 Cal. 481; *O'Connor v. Irvine*, 74 Cal. 435 [16 P. 236]; *Hellman v. Messmer, supra;* Rest., Trusts, § 448.) ■ Nor is a resulting trust prevented by an assumption by the transferee of an obligation to the vendor or transferor to pay the purchase price, where the claimant is obligated to reimburse the transferee. In such a case there is loan of credit by the transferee to the claimant (*Watson v. Poore, supra;* see *Stromerson v. Averill, supra;* Rest., Trusts, § 456, comment d). The case of *Lincoln v. Chamberlain*, 61 Cal.App. 399 [214 P. 1013], is distinguishable inasmuch as there was no loan by the transferee in that

case to the claimant at or prior to the time of the transaction. After the transaction the claimant promised to pay for the property. The statement therein that: "... it must be shown that the party setting up the trust paid the money either at or before the execution of the conveyance and as a part of the original transaction of purchase," is out of harmony with the foregoing authorities and must be disapproved insofar as it requires that the money be actually paid by the claimant "at or before the execution of the conveyance." ■ Contrary to defendant's contention it is not necessary that there be an express agreement by the claimant to repay the loan. An agreement to repay may be implied. (*Brown* v. *Spencer, supra; Couts* v. *Winston,* 153 Cal. 686 [96 P. 357].) Of course, the trustee of the resulting trust holds the legal title as security for the loan. (*Watson* v. *Poore, supra; Stromerson* v. *Averill, supra.*)

■ Defendant contends that there can be no resulting trust because there was an express agreement between the parties that defendant would make the loan and hold title in trust for plaintiffs. Where the elements of a resulting trust are present, the fact that transferee and payor of the purchase price, and the claimant, made an oral agreement that the former was to hold the property in trust for the latter which was unenforceable under the statute of frauds or otherwise, does not prevent a resulting trust from arising. Indeed, such agreement supports the inference or presumption that the payor did not intend that the transferee should have the beneficial interest. (See *Bayles* v. *Baxter,* 22 Cal. 575; *Breitenbucher* v. *Oppenheim,* 160 Cal. 98 [116 P. 55]; *Stromerson* v. *Averill, supra; Watson* v. *Poore, supra; Gerety* v. *O'Sheehan,* 9 Cal.App. 447 [99 P. 545]; *Pavlovich* v. *Pavlovich,* 22 Cal.App. 500 [135 P. 303]; *Root* v. *Kuhn,* 51 Cal.App. 600 [197 P. 150]; *Juranek* v. *Juranek,* 29 Cal.App.2d 276 [84 P.2d 195]; Rest., Trust, § 441, comment j; 12 Mich.L.Rev. 427; 42 A.L.R. 10, 55.)

■ The trust is not defeated by the failure of the association to tender the borrowed moneys.

"Mary's declination to render a statement and her repudiation of the loan agreement and the trust rendered further tenders idle and unnecessary (*Penziner* v. *West American Finance Co.,* 133 Cal.App. 578, 586 [24 P.2d 501]).

"No other equitable ground is alleged or proved that would

justify a judicial defeat of the trust relationship. [Defendant] was free to make the loan. She received a valuable consideration for it. She continued to enjoy the relationship for eighteen months at the expiration of which she was free to enforce her lien for the moneys she had advanced.

"It is thus demonstrated that the findings with reference to the La Brea property find abundant and substantial support in the record leaving this court without power to alter the conclusions derived by the court below."

In the light of the law above set forth none of the authorities cited by defendant is controlling in the instant case.

"The evidence is equally abundant to support the findings that the University owns the personal property which it claimed, that Ruth was not a guest of Mary; that [defendant] is not the owner of the chattels used by the association in the La Brea house and that the only moneys advanced by Mary to the association were those used for the purchase and for taxes and improvement of the property. [Defendant] witnessed the conversation whereby Ruth was employed to operate the house. The latter engaged a number of employees to do the menial tasks from February, 1941, till May, 1942. By her own testimony and that of Mrs. Munson, Mrs. Schneider and Miss Yaryan, Ruth established that Mary neither brought any furniture into the house nor made a payment on that which was purchased, and that she did no work either as a domestic or as instructor for [plaintiffs]. Because of such proof and its acceptance by the court, [defendant's] asserted claims of a lien as an innkeeper upon the personal property in the La Brea house are utterly without right (*Fox* v. *Windermere Hotel A. Co.*, 30 Cal.App. 162 [157 P. 820]). . . ."

Defendant "complains that the amount of her award should have been $2,489.31 instead of $1,679.62, allowed by the judgment. In support of this she cites her own testimony with reference to a payment she made to the painter, the constant tendency of Mrs. Viner to exaggerate, and the misstatement of Exhibit 39. For reasons heretofore recited we cannot retry the comparative veracity or accuracy of the witnesses. On the contrary, the findings and decision determined that Mary is entitled to a total of $1,679.62, the full amount of her loans, but that she is indebted to [plaintiffs] for net rentals collected, $623.55; . . . counsel fees, $1,000, . . . [and] costs in the sum of $208.35."

The court reserved the right to a further accounting when defendant had complied with the decree.

The plaintiffs alleged that defendant without right or claim of right has wilfully failed to return the personal property for the purpose of harassing them and that they are entitled to $1,000 punitive damages and $1,000 attorney's fees expended in pursuit of that property. The court found the allegation true but did not award punitive damages, rather it found that plaintiffs had incurred attorney's fees in the sum of $1,000 in pursuit of the property and awarded that amount.

Generally, fees paid to attorneys are not recoverable from the opposing party either as costs, damages or otherwise in the absence of express statutory or contractual authority. (Code Civ. Proc., § 1021; 7 Cal.Jur. 286-288; 8 Cal.Jur. 801-802; 24 Cal.Jur. 1055-1056.) Plaintiffs rely upon section 3336 of the Civil Code declaring the detriment caused by the wrongful conversion of personal property is presumed to be "a fair compensation for the time and money properly expended in pursuit of the property." Attorney's fees are not recoverable under that section. (*Hays* v. *Windsor*, 130 Cal. 230 [62 P. 395]; *W. R. Bradshaw & Co.* v. *Eggers*, 27 Cal.App. 132 [148 P. 961]; *Nicholls* v. *Mapes*, 1 Cal.App. 349 [82 P. 265]; see *Murphy* v. *Mulgrew*, 102 Cal. 547 [36 P. 857, 41 Am.St.Rep. 200]; *Spooner* v. *Cady*, 5 Cal.Unrep. 357 [44 P. 1018]; *Greenbaum* v. *Martinez*, 86 Cal. 459 [25 P. 12]; *Martland* v. *Bekins Van & Storage Co.*, 19 Cal.App. 283 [125 P. 759]; *Drinkhouse* v. *Van Ness*, 202 Cal. 359 [260 P. 869]; *Harris* v. *Smith*, 132 Cal. 316 [64 P. 409]; *Holm* v. *Davis*, 8 Cal.App.2d 328 [47 P.2d 537].)

Plaintiffs assert that the allegations in their complaint and statements in the findings concerning attorney's fees should be ignored or interpreted as really referring to punitive damage. While it is true that the court found the detention of plaintiffs' property was without claim of right and for the purpose of harassing plaintiffs, yet no *punitive damages* are awarded and the findings unequivocally made an award of attorney's fees rather than punitive damages. For illustration, with reference to plaintiff Western States University, the court found that it "has been required to employ . . . attorneys at law, . . . as its attorneys in order to secure a return of said property, and has incurred an attorneys' fee in the sum of $500.00 therefore to said attorneys, and is en-

titled to judgment in said sum, which said sum is a reasonable sum therefor.''

We find no room for interpretation in the matter. Moreover, it is improper to include attorney's fees as a part of exemplary damages. (*Howell* v. *Scoggins,* 48 Cal. 355; *Falk* v. *Waterman,* 49 Cal. 224.) Accordingly, the judgment should be modified by striking therefrom the item of $500 for attorney's fees awarded each of the plaintiffs, and as so modified, the judgment is affirmed. Neither party to recover costs on this appeal.

Gibson, C. J., Shenk, J., Edmonds, J., Schauer, J., and Spence, J., concurred.

TRAYNOR, J.—I concur. My views with respect to the scope of appellate review in cases where ''clear and convincing evidence'' is required are set forth in my dissenting opinions in *Stromerson* v. *Averill,* 22 Cal.2d 808, 817 [141 P.2d 732], and *Beeler* v. *American Trust Co.,* 24 Cal.2d 1, 29 [147 P.2d 583]. These views remain unchanged, but the rule announced in those cases now governs the scope of appellate review in this state.