[Civ. No. 14627. First Dist., Div. Two. Aug. 2, 1951.]

C. D. DORN, as Executor, etc., Appellant, v. R. N. PICHININO et al., Respondents.

Anthony S. Devoto for Appellant.

Edward A. Cunha and Dean Cunha for Respondents.

GOODELL, J.—Plaintiff sued to cancel and set aside the transfer of 100 shares of Bank of America stock made by David Brown, a man in his late 70's, on August 19, 1947, about a year before his death. The principal defendant is Richard Wade Pichinino, a minor, the donee of the gift. His father, R. N. Pichinino, is also a defendant in his individual capacity, as well as guardian *ad litem* herein of Richard. The 100 shares have since become 120 by virtue of a stock dividend. The bank, which was joined as a defendant, has no interest in the litigation.

The case is exceptional in that the alleged undue influence is not charged, as in most cases, against the donee—a boy of 14 at the time—but against his father. The court in its findings held that there was no undue influence, and from the judgment entered thereon this appeal was taken.

The first witness called by the plaintiff (under § 2055) was the boy's father, who testified substantially as follows:

At the time of the transaction he was head of the stock and bond department of the Number 1 Powell Street branch of the Bank of America in San Francisco and had been such for about 16 years. He "handled all the transfers of stock, the sale of stock and bonds, and the safe-keeping of items that came into the branch, the sale of government securities, and the purchase of them." It was not one of his functions to advise customers relative to the sale or transfer of stocks and bonds.

He met David Brown about 1930 or 31 at that branch, in connection with the cashing of coupons on some foreign bonds which Brown held. The acquaintance increased and continued during all those years. Brown never consulted, or was advised by, Pichinino respecting the buying or selling of stock. There were, however, many transactions in which he had helped Brown, one of which was a transfer of 87 shares of Bank of America stock and 289½ shares of Transamerica, from joint tenancy into Brown's sole name. After the death of Mrs. Brown in 1944, Brown in 1945 had caused those shares to be transferred into the names of Alice Schweitzer (his wife's sister) and himself as joint tenants. In 1946 or early 1947 Brown wanted to get this stock into his own name, but Mrs. Schweitzer would not consent. Brown, who came

into the bank three or four times a day, consulted Pichinino as to his next move, and was told that if his sister-in-law would not assign, Brown would have to sue. Finally Mrs. Harriet Lewis, another sister of Mrs. Brown, came to the bank representing Mrs. Schweitzer, who was ill, and told Pichinino that her sister was willing to make the transfer provided Brown would relinquish his share of his wife's estate. Pichinino so informed Brown, who assented (and made the relinquishment), and Pichinino through his department attended to the transfer from the joint tenancy into Brown's own name.

After that transfer had been accomplished Brown told Pichinino "Well, you've been very kind to me. I desire to do something for you" who replied "You don't have to do anything for me, I'm only too glad to help you to get you out of this trouble." Brown continued to come into the bank daily, telling Pichinino what he wanted to do for him, to which he replied "I don't want nothing." Finally Brown said, "If I can't do something for you I'll do something for your boy" to which Pichinino replied, "If you want to do something for my son, that's entirely up to you." Brown then brought in a certificate for 100 shares and said "I want to make a gift of this 100 shares of the Bank of America to your son." After repeating that it was entirely up to him, Pichinino added "However, it would be better if you put this stock in your name as trustee, so you could get the benefit of the dividends while you are living" to which Brown replied, "That's perfectly agreeable to me." The certificate was then reissued in the name of David Brown, trustee for Richard Wade Pichinino, and delivered to the father for the boy. Pichinino attended to the details, which duty was part of his department's routine business.

Pichinino gave further testimony under section 2055, which showed that Brown had a most friendly feeling toward him and called on him repeatedly for assistance in his personal affairs. For instance, one evening while defendant was attending the fights in San Jose he was called out of the hall over the loud speaker to find that Brown wanted him to come to San Francisco immediately, and he did so that night. When Brown went to the hospital during his last illness he had Pichinino's name put on his safe-deposit box, and had Pichinino attend to the payment of his hospital and nurses' bills for him. In October, 1947, he made a will in favor of Pichinino,

but later made a new will (the one admitted to probate) which left nothing to him.

After the transaction in question Brown made a gift to a woman friend of his, and of his deceased wife, of 100 shares of Transamerica stock, making the certificates out to himself as trustee for her so he could collect the dividends while he lived (as had been done with the boy's certificate).

Appellant's first contention is that "the testimony of plaintiff's witnesses was *unimpeached* and *uncontradicted* and that he, as such executor, was therefore entitled to judgment cancelling said certificates, and that the trial court erred in holding otherwise."

The testimony just summarized was given by the only surviving witness to the transaction, and, while it is true Pichinino was an adverse witness and plaintiff was not bound by his testimony, once it was before the court it was, in the language of the Supreme Court, "substantive evidence in the case for all purposes to which it was relevant." (*Goehring* v. *Rogers,* 67 Cal.App. 260, 263 [227 P. 689] in denying a hearing therein after a decision in this court). In *Figari* v. *Olcese,* 184 Cal. 775, 782 [195 P. 425, 15 A.L.R. 192], where the defendants (as here) testified only as adverse witnesses called by the plaintiff, the court said, "there is no merit in appellant's objection that *no testimony was taken in behalf of defendants,* because of the fact that the defendants were called only as plaintiff's witnesses." (Emphasis added.) Then, after quoting section 2055, the court continued: "This provision does not mean that such testimony may not be given its proper weight, but merely, as it declares, that the party calling such witness shall not be concluded from rebutting his testimony, or from impeaching the witness [citation]. In other words, such testimony is to be treated as though given on cross-examination." We hasten to add, parenthetically, that this rule is confined to the weight and effect of such evidence *at the time when a cause is finally submitted after a trial on the merits,* and has nothing to do with the situation presented on a motion for nonsuit or a directed verdict, where such evidence is viewed quite differently.

This cause was submitted by defendants for decision on its merits as soon as plaintiff rested, hence the rule is fully operative in this case.

The testimony of Pichinino respecting the circumstances of the transaction stands (to use appellant's language) wholly "unimpeached and uncontradicted," and under the authori-

ties just cited it was entitled to be given the same weight as if "taken in behalf of defendants" (*Figari* v. *Olcese, supra*). Judging from the outcome, the court gave it its full weight on the defense side. Further, his testimony dealing with the Brown-Schweitzer joint tenancy, was not only "unimpeached and uncontradicted" but corroborated by plaintiff's witness Harriet Lewis.

In deciding this case from the bench the court said: "I don't think the case has been proved by a preponderance of the evidence. I am satisfied there was a valid gift here, and I don't see any undue influence." This brings us to the question of the burden of proof—a question of no small importance in such cases as this (e.g., *Bank of America* v. *Crawford*, 69 Cal.App.2d 697, 702 [160 P.2d 169].)

Despite the finding that there was no confidential relationship, appellant repeatedly presses the argument that *there was*, and, based on that *assumed premise*, seeks to shift the burden onto the defense.

 Section 1963, Code of Civil Procedure, contains two familiar disputable presumptions which are applicable here, first, subdivision 1, "That a person is innocent of crime or wrong" and, second, subdivision 19, "That private transactions have been fair and regular."

In 12 California Jurisprudence, page 816, section 71, it is said: "Fraud is odious and is never presumed; it must be established by proof. The presumption always is in favor of fair dealing, except, perhaps, where confidential relations are involved. This presumption has been said to approximate in strength that of innocence of crime. The burden of proving fraud, therefore, rests upon the person asserting it. . . ." The next section (72) deals with presumptions arising from confidential relations. It points out that *in such a situation* there *is* a presumption (see Civ. Code, § 2235) that any advantage was gained by undue influence. Section 7 of the article on Fraud and Deceit (12 Cal.Jur. 713 et seq.) enumerates the several relationships which supply the basis for a presumption of a confidential relationship, but that of banker-and-depositor or customer is not among them.

In the trial court, then, the plaintiff had the burden of proving that defendant R. N. Pichinino had exerted undue influence over the donor, and in carrying this burden he was not aided by any presumption. On the contrary he had to overcome and dispel the presumptions of innocence of wrong,

and fairness of transaction with which the defendants were clothed.

In plaintiff's examination of Pichinino under section 2055 he was questioned respecting the preliminary transaction arising out of a joint tenancy which had existed between Brown and Alice Schweitzer. When asked "Did you make any threats to Mrs. Lewis at that time?" he answered "No, sir." "Or to Mrs. Schweitzer at any time?" and answered "No, sir." "Q. Did you threaten either or both of these ladies? A. No, sir. Q. That if they didn't give up that stock that you would do something? A. No, sir. Q. You did not? A. No, sir. Q. You made no threats of any kind to them? A. No, sir." Although these questions were confined to a threatening of Brown's sisters-in-law, and not himself, the defendant's answers, if they had admitted threats, might have supplied some evidence at least of a threatening tendency or disposition. Instead, the answers were clear-cut "No, sirs."

When asked by plaintiff's counsel "You didn't suggest to Mr. Brown that he do this?" he answered "No, sir." "Q. You didn't advise him to do it? A. No, sir."

Later he was asked by plaintiff's counsel: "Q. Now, Mr. Pichinino, after this will of . . . October 2d, 1947, was executed by Mr. Brown . . . did you make any threats to Mr. Brown? A. I did not. Q. Did you threaten Mr. Brown that if he made another will that you'd send him to an asylum? A. I did not. Q. Did you at *any* time make such a threat to Mr. Brown? A. No, sir. Q. At *no* time. A. No, sir." [Emphasis added.]

Had the defendant admitted threatening Brown, or had he answered hesitantly, evasively, or equivocally, plaintiff would have been well on his way toward proving, out of the defendant's own mouth, the pressure which plaintiff had the burden of establishing. Instead, his answers were positive, definite, clear-cut, and unequivocal. Whatever emphasis the witness might have expressed in his answers "No, sir" and "I did not," and his appearance and demeanor on the stand, were matters wholly within the observation and the province of the trial judge.

An examination such as this, under section 2055, "is often exploratory" (*Lawless* v. *Calaway*, 24 Cal.2d 81, 91 [147 P.2d 604]) and this examination might fairly be so characterized.

The examination included questions respecting threats around October 2, 1947, which was over a month after the transfer in question and hence remote therefrom, and not

directed to the time of the claimed pressure respecting the boy's stock, but they included, also, questions respecting *any* threats and threats "at *any* time," which, of course, included the precise time under inquiry.

The defendant's denials of *any* threats, and his testimony that he did not "suggest to Mr. Brown that he do this" or "advise him to do it" (meaning make the gift), left the plaintiff without any direct or competent proof of threats at or around the time of the transfer, or any evidence of activity on the part of Pichinino toward procurement, inducement, persuasion, or pressure. ■ "It is elementary that if a plaintiff examines his adversary under section 2055, for the purpose of proving a fact essential to his cause of action, and the testimony given negatives the existence of the fact, a failure of proof results unless the plaintiff produces other evidence sufficient to establish the fact. He has, of course, the right to produce such evidence." (*Kambourian* v. *Gray*, 81 Cal.App.2d 783, 788 [185 P.2d 27].)

Appellant, while repeatedly arguing that a confidential relationship existed, cites no authority whatever which involves banker-and-customer dealings or where the facts are anywhere nearly comparable with these facts. He cites such cases as *Bank of America* v. *Crawford, supra,* 69 Cal.App.2d 697, 701, *where the trial court found a confidential relationship to exist* and the appellate court, at page 702, pointed out that *because of its existence* the burden shifted to the defendant to prove that the transfer "was entirely voluntary, uninfluenced by his [donor's] relationship with defendant or by adverse pressure of any sort."

Appellant also cites *Estate of Graves,* 202 Cal. 258 [259 P. 935], and from its language constructs a formula of five "well established facts which are recognized as being indicative of undue influence or subversion of one's volition." But that case was one where *the jury found that a confidential relationship existed,* hence it belongs in the same category as the Crawford case. One of the five elements so listed is *opportunity.* But in the Graves case itself it was said (p. 262) that: "mere proof of opportunity to influence the mind of the testatrix, even though shown to be coupled with an interest, or a motive to do so, does not sustain a finding of undue influence, in the absence of testimony showing that there was pressure operating directly on her testamentary act."

In the case at bar there was not only a failure of proof of any pressure, but there was definite evidence to the contrary

in Pichinino's testimony under section 2055 which was, after all, "in behalf of the defendants." *(Figari v. Olcese, supra.)*

Appellant cites 4 California Jurisprudence, page 778, which deals with "Gifts or benefits from a principal to one occupying a fiduciary or confidential relationship to him . . ." which, again, begs the question, since the trial court found no such relationship. Moreover, in the interest of accuracy it should be noted that that text was written before the court in *Brown v. Canadian etc. Co.*, 209 Cal. 596, 599 [289 P. 613], pointed out that independent advice *in cases of a confidential relationship* (which that case was) was not indispensable, although it was a "circumstance to be considered in determining whether the gift should be avoided." For these reasons the text invoked is not in point.

Appellant's remaining contention is that the "court committed reversible error by rulings made in the rejection of evidence."

The first attack under this head involves the following series of five questions asked plaintiff's witness Harriet H. Lewis, designed to bring out the donor's state of mind about the time of the transfer in August, 1947:

"Did you have any conversations with him relative to his dealings with Pichinino?

"Mrs. Lewis, shortly before August of 1947, did Mr. Brown ever express to you his opinion of Mr. Pichinino?

"During August of 1947, did Mr. Brown discuss with you Mr. Pichinino and his opinion of him?

"During August, 1947, did Mr. Brown discuss his relations with Pichinino?" and

"Did Mr. Brown ever discuss with you the control or possession of his moneys and securities?"

An objection to each was sustained in turn.

That the theory on which each of these questions was asked was thoroughly grasped by the trial judge appears from his remarks in sustaining the objection to the first. His remarks show that he considered the testimony admissible, if developed by proper questions, for he then said, referring to appellant's authorities: "those authorities very definitely state that the question can only call for the state of mind or intent of the declarant, and you can't go any further than that. The rule is when the intention or state of mind of the alleged donor is involved evidence of declarations made by him before or after the transaction is admissible, though the declarations were not made in the presence of the adverse

party. Your question is too broad. It doesn't call for the state of mind of the declarant.''

These remarks contain a fair general summary of the decision now relied on by appellant to support his claim of error, namely, *Nanny* v. *H. E. Pogue Distillery Co.*, 56 Cal.App.2d 817, 824 [133 P.2d 686]. The judge's attitude was directly opposite to that appearing in some cases (e.g., *Lawless* v. *Calaway*, 24 Cal.2d 81, 91 [147 P.2d 604]) where a judge indicates in advance that a proffered line of testimony will *not* be admitted.

After sustaining the objection to the fifth question of the series, the court volunteered the suggestion that ''You can ask for conversations that will show a state of mind,'' whereupon counsel asked: ''Mrs. Lewis, during July or August of 1947, did you have any conversation with Mr. Brown relative to his money and securities?''

That question fairly embraced everything that counsel was seeking to bring out by his series of questions, and opened up the whole subject. There was an objection but the court ruled: ''I will allow that conversation subject to a motion to strike. It is difficult for the Court to know beforehand whether or not the conversation will bear on the question of intent. First, the question is, did you have a conversation with Mr. Brown relative to his property or estate . . . in July or August of 1947?'' After the witness had given several answers defense counsel interrupted, but the court said ''Let's get the whole conversation and see if there is anything material'' and she proceeded with her testimony. Defendants then moved to strike ''the last three answers.'' The last four questions and answers were ''Q. Did he say anything else? A. We said [sic. *''we''* not *''he''*] 'We hope you realize what you are doing.' Q. What did he say? A. 'He's going to do great things. He can do anything down at the bank.' Q. By 'he' he meant whom? A. Mr. Pichinino. Q. . . . Did he say anything else? A. No, he didn't say anything else about it, because we didn't pursue the subject further. We just visited.''

The court remarked: ''And I am granting the motion to strike because the only declarations you are entitled to are those which bear upon the intent of the declarant with reference to the transaction at issue. In other words, you can show his intent with reference to the transfer of this particular item of stock. . . . All the questions and answers here have nothing to do with his intent as to the transfer of that stock. . . . It doesn't show his state of mind with reference to the

transfer of this stock. All this testimony has shown is that he regarded him as a very important figure down at the bank." The last three answers were struck out, but the rest of the testimony of Mrs. Lewis remains in the record.

■ There was no error in the rulings on the five questions since the final question asked by plaintiff's counsel *on the court's own suggestion and with the court's help* opened the door for all the testimony which each and all of the five questions could have possibly brought out. The fact that the witness did not give a responsive or satisfactory answer after she was finally permitted to express herself does not add any force to appellant's assertion of error but, rather, detracts therefrom.

■ Appellant next attacks the sustaining of an objection to this question asked plaintiff's witness Elizabeth Knowlton: "Did he ever have discussions with you within . . . one year before his death about the control or possession of his moneys or securities?" The form of the question followed somewhat that finally asked of Mrs. Lewis, except that instead of being confined to July and August, 1947, as that question was, this took in the whole year before Brown's death. That, alone, made it too broad, and there is no reason whatever why it could not have been cast in exactly the same form with respect to the time element as that ultimately asked of Mrs. Lewis. The judge having allowed it in her case (and even phrased it himself) he certainly must have, consistently, allowed it again. There was no error in that ruling.

■ And, finally, appellant attacks the court's ruling in striking out all Mrs. Knowlton's testimony with the exception of that "with respect to the conference at which Brown, herself and Pichinino were present." It is not necessary to state this testimony; it is sufficient to say that it related to immaterial and inadmissible matters not bearing on the donor's state of mind (*Nanny* v. *H. E. Pogue Distillery Co., supra*). Appellant merely *asserts* reversible error without suggesting any reason or supplying any authority.

After the striking out of the bulk of Mrs. Knowlton's testimony, she volunteered that "Due to the difficulty with my hearing, most conversations, unless I was paying definite attention, I didn't hear at all. . . ." This aural defect, freely admitted, was for the trial court to consider in connection with *all* her testimony. She also testified (and it remained in the record) that she heard Pichinino remark that "if Mr. Brown didn't stop writing so many wills the court would adjudge him incompetent."

█ To sum up: appellant opened his argument with the positive assertion that "the testimony of plaintiff's witnesses was *unimpeached* and *uncontradicted*." The plaintiff's witnesses were the donor's two sisters-in-law, his brother-in-law, Mrs. Knowlton, Mrs. Spofford and the plaintiff-executor. We have already dealt with the testimony of Mrs. Lewis. With respect to the testimony of the others it is sufficient to say that it was favorable to plaintiff's side.

On the other hand, on the defense side there was the direct testimony of Pichinino, given under section 2055, which detailed the transaction itself, which showed that the gift of the 100 shares was *conceived by the donor* and was not made on the advice, suggestion, urging or pressure of Pichinino (see *Estate of Wieling*, 37 Cal.2d 106 [230 P.2d 808]; *Smith* v. *Lombard*, 201 Cal. 518, 524-5 [258 P. 55]); which showed also that no threats had been made by Pichinino either to the sisters-in-law or to the donor, and which showed that Pichinino had himself suggested, after the donor had determined to make the gift, that the certificate should be made out (as it was) in the donor's name as trustee for the boy. This defense testimony was to be weighed against that given on the plaintiff's side, and to a large extent and in important details it was uncontradicted.

All this court has to do is to determine whether the evidence, when viewed in the light most favorable to the respondents, supports the findings. Even in cases where the evidence must be "clear, satisfactory and convincing" (of which this is not one) the question whether it is of that character is primarily one for the trial court, and its determination is not open to review on appeal if there is substantial evidence to support its conclusion (*Viner* v. *Untrecht*, 26 Cal.2d 261, 267 [158 P.2d 3]). In the instant case there was ample evidence to support the findings.

The judgment is affirmed.

Nourse, P. J., and Dooling, J., concurred.