[L. A. No. 16787. In Bank.—July 28, 1941.]

JOHN T. WATSON, Plaintiff and Respondent, v. ALVIN H. POORE et al., Appellants; INEZ WATSON, Defendant and Respondent.

[L. A. No. 16788. In Bank.—July 28, 1941.]

S. P. LEFFLER et al., Plaintiffs and Respondents, v. JACK WATSON et al., Defendants and Respondents; ALVIN H. POORE et al., Appellants.

[L. A. No. 16789. In Bank.—July 28, 1941.]

ALVIN H. POORE et al., Plaintiffs and Appellants, v. PROW & LEFFLER (a Copartnership) et al., Defendants and Respondents.

Hector P. Baida and Tanner, Odell & Taft for Appellants.

B. W. Burkhead, Claude A. Shutt and Arthur E. Briggs for Respondents.

CARTER, J.—These three cases were consolidated in the court below and on this appeal. They all involve the interests of the respective parties in a certain ten acre tract of real property situated in Los Angeles County. From the voluminous pleadings it appears that the nature of the actions is essentially as follows:

In the first action respondent, Watson, sought to have established a resulting trust in his favor in the real property against appellants, Alvin H. Poore and Beulah Poore, husband and wife. Involved in that action, by reason of Poores' defenses, also were a release and deeds to the property from Watson to the Poores; those instruments were set aside by the trial court for fraud and lack of delivery. In the second action appellants sought to eject respondents S. P. Leffler and Nellie E. Leffler, husband and wife, from two acres of the property. In the third action respondents, Lefflers, sought to establish that appellants and respondent, Watson, conspired to deprive them of two acres of the property. A demurrer was sustained to the Lefflers' complaint in that action and no amendment was offered, but the Poores having filed a cross-complaint therein claiming that the Lefflers had no interest in the property, the trial proceeded on the issues raised by the cross-complaint. After trial before the court without a jury, separate findings and judgments were entered in each action. They established the resulting trust and determined that Watson was the owner of the property subject to a $5,500 note secured by a trust deed in which Poore and wife were the makers and trustors and the Warren estate the beneficiary, declared to be in full force and effect a contract of sale of two acres of the real property in which Watson is the vendor and

the Lefflers the vendees, and set aside a release of Poores by Watson and deeds from the latter to the former of the ten acres in question and other property. This appeal is taken from those judgments.

In 1927, Cornelius Kallmeyer owned the ten acre tract involved, subject to an indebtedness of $5,000 represented by his promissory note payable to a certain Mr. Hunt on April 1, 1931, and secured by a deed of trust encumbering the land. Hunt transferred that note and trust deed to the Warren estate. On June 3, 1927, Kallmeyer agreed to sell five acres of the property to respondent, Watson, for $10,000, half of which was paid in cash and respondent assumed and agreed to pay the Hunt note. On February 4, 1928, respondent Watson contracted to sell two acres of the five acre tract to respondents Lefflers for $6,500. The latter took possession under the contract and still are in possession, paid $1,500 cash, and agreed to pay the balance of $5,000 on February 3, 1931; they expended considerable sums improving the property. Watson being unable to furnish a merchantable title to the two acres, because of a defect therein affecting the entire property consisting of a trust not here involved, Lefflers refused to pay the $5,000 when it became due. In March, 1933, Watson and Kallmeyer having failed to pay the Hunt note, the Warren estate gave notice of election to sell the ten acres on August 12, 1933, under the trust deed securing the Hunt note. The property was sold on that date and purchased by the Warren estate, the beneficiary. Watson and Kallmeyer carried on negotiations to purchase the ten acres from the Warren estate. In 1933, Watson borrowed $1,200 from appellant Poore to finance that transaction for which he gave a note to Poore and a mortgage securing the same covering certain real property in El Monte, not directly involved here. In November, 1933, the endeavor of Kallmeyer and Watson to purchase the property having been unavailing, Kallmeyer sued Watson for $25,000 damages claimed to have been suffered by reason of Watson's failure to perform his contract with Kallmeyer to purchase the five acres of the property. It is claimed by Watson that thereafter Poore agreed to purchase the property from the Warren estate for $6,500, paying $1,000 cash and giving a note and trust deed for the balance; and that the purchase was made by Poore for Watson; and that the money which Poore loaned to Watson was used for the initial pay-

ment; that Poore was to convey two acres included in the Leffler contract to the Lefflers for $3,000; and that Watson and his wife conveyed certain property in El Monte, (hereinafter referred to as El Monte City property) to Poore as security for the loan of the money used in the purchase. Thereafter, in December of 1933 and January of 1934, Poore purchased the ten acre tract from the Warren estate at a probate sale for $6,500, paying $1,000 cash; the balance was represented by a note and trust deed executed by Poore covering the ten acre tract. Poore took title in his name. The note was payable in installments of $100 per month. In January, 1934, Watson settled the damage action brought against him by Kallmeyer. Poore being in possession of eight of the ten acres received the income therefrom.

In August of 1935, Inez Watson sued Watson for a divorce including therein Poore and his wife as defendants and endeavoring to establish that Poore held the ten acres as a resulting trustee for her and to recover the El Monte City property. In that action Poore filed a cross-complaint to quiet title to the ten acres as against Watson and Inez Watson. Judgment was entered in 1936 awarding all of the El Monte City property to Inez Watson as her separate property except certain lots which were awarded to Watson, and a money judgment for some $2,500 against Poore for income received from the El Monte City property. An interlocutory decree of divorce was rendered and Watson was ordered to make certain payments to his wife. It was decreed that Inez Watson had no interest in the property here involved but no determination was made in respect to the title as between Poore and Watson. The Poores appealed from that judgment. They dismissed their appeal and paid $2,000 to Inez Watson in settlement of her $2,500 judgment. Watson executed deeds to the ten acres and property in El Monte in Poore's favor and a release of all claims against Poore. The divorce decree, deeds and release were pleaded as a defense by appellants to Watson's action. The trial court found that the deeds and release were executed upon the false and fraudulent representation of Poore to Watson, that the former had to have those instruments to make a settlement with Inez Watson, and that said instruments were a settlement of the claims between Watson and his wife, and further found that there was no delivery of the deeds, and that the divorce decree was not *res judicata.*

Appellants also claimed two other judgments as being *res judicata* on the issue of the ownership of the ten acres by them. In one action, entitled *Kallmeyer* v. *Kallmeyer and John T. Watson, et al.*, the judgment was entered November 13, 1934, the other was *Poore* v. *Kallmeyer*, in which the judgment was entered on October 18, 1935. In both of those actions the title to the property in question was involved.

Poores, the appellants, urge several grounds for the reversal of the judgments in these cases, most of which are aimed at the conclusion of the trial court that they held the property as resulting trustees for Watson. They contend that the evidence is insufficient to support that determination, that even if there is such a trust, Watson is not entitled to relief because he was *in pari delicto* with Poore in that the property was taken in Poores' name at Watson's behest to defraud Watson's wife and other creditors and that therefore Watson not having clean hands is not entitled to equitable relief, that at most Watson would be entitled to only a *pro tanto* interest in the property, that is, to the extent of the $1,000 down payment, that there was no proper restoration and rescission of the settlement in which Watson gave Poore a release and deeds to the property, and that the above mentioned judgments conclusively established that Poores and not Watson were the owners of the property.

The trial court's conclusion that the judgments, pleaded as being *res judicata*, were not a bar to Watson's claim to an interest in the property must be sustained. In the Watson divorce action, while it is true that appellants sought to quiet title by cross-complaint, against Watson and wife, and Watson failed to answer the same and default was entered by the clerk, the court did not render a default judgment against him and it made no finding thereon other than that appellants had purchased the property and that *Inez Watson* had no interest therein. There was no decree that Watson had no interest in the property or that appellants were the exclusive owners.

In the action of *Kallmeyer* v. *Kallmeyer and Watson*, the court in its judgment specifically provided that it was making no determination of the interests in the property as between Watson and Poores. As found by the court in the case at bar that judgment contained the following paragraph:

"That this Decree shall *not be binding or conclusive* between F. A. Leonard, as Executor, aforesaid, and the Warren

heirs, on the one hand, Prow and Leffler on the other hand, and *Alvin H. Poore and Beulah Poore,* on the third hand, *and John T. and Inez Watson on the fourth* hand, *as to the rights of said parties, between themselves,* but shall be binding as between them, or any of them, and any and all other parties to this action."

█ In the last above-mentioned action, (*Poore* v. *Kallmeyer*) Watson was not a party thereto, and therefore is not bound by the judgment.

█ The evidence concerning the resulting trust, although highly conflicting, is sufficient to support the judgments. According to Watson's testimony, he and Poore had been acquainted for about fifteen years. After Kallmeyer and Watson were unable to raise sufficient funds to purchase the property from the Warren estate, Watson called on Poore who agreed to loan to him $1,200 to consummate the transaction. Poore advised Watson, however, that it would not be wise to let Kallmeyer handle the money or make the arrangement in his name. The endeavors of Kallmeyer and Watson to purchase the property bore no fruit. On August 10, 1933, Watson received the $1,200 and gave Poore a note and mortgage on the El Monte City property, not here directly involved. Watson does not know what happened to that note and mortgage; Poore claims he never accepted them. Watson being worried about a threatened suit against him by the Lefflers on their contract to purchase two acres, asked Poore for advice. Poore suggested that Watson have Poore buy the property from the Warren estate for him. Watson and wife transferred the El Monte City property to Poore as security for the $1,200 loan. The $1,200 and portions thereof were transferred back and forth between Watson and Poore several times. Finally Poore told Watson that he should give him $1,000 and that Poore would purchase the property for Watson making a $1,000 down payment and arrange for the balance to be paid in monthly installments of $100 per month. Poore agreed that if Watson was unable to make the payments, Poore would pay them out of the moneys he owed to Watson for labor or from the income from the property; that Poore would perform Watson's agreement with the Lefflers to let them have the two acres for $3,000 without removing the defect from the title. Pursuant to that arrangement Watson gave Poore $750, and Poore stated that Watson still had $200

payable to him on the $1,200 loan which could be used for the balance. In December of 1933, and January of 1934, Poore purchased the property at probate sale from the Warren estate for $6,500, paying $1,000 down and executing a note payable $100 per month secured by a deed of trust for the balance. The property was deeded to the Poores; they made no settlement with the Lefflers and thereafter denied that Watson had any interest in the property.

It is true that the evidence shows that Watson made prior inconsistent statements under oath and his testimony on direct examination was impeached in several particulars on cross-examination; and that Poore maintained throughout in his pleadings and at the trial that there was never any agreement or arrangement whereby he was purchasing the property with Watson's money for Watson. However, it is within the exclusive province of the trial court to pass upon the credibility of the witnesses and the weight of the evidence. It cannot be said that Watson's credibility was so wholly impeached that as a matter of law this court may disregard his testimony.

Appellants assert that Watson was not entitled to the equitable relief given, that is, the establishment of a resulting trust, because he did not have clean hands. Their theory is that the El Monte property which was transferred to Poore as security for the $1,200 loan, belonged to Watson's wife, and that in the action of *Watson* v. *Watson,* it was found that Watson fraudulently caused his wife to convey that property to improperly deprive her of it; and that having Poore purchase the ten acres in his name was done with the intent to defraud Kallmeyer and Lefflers, Watson's creditors. Appellants did not plead the defense of unclean hands and the trial court made no finding thereon, unless it may be said that the finding of the existence of a resulting trust carried with it a finding against that defense by implication.

It is the general rule that equitable relief in the nature of the establishment of a resulting trust will not be granted where the proponent had the resulting trustee take title in the latter's name in order to defraud the proponent's creditors; the doctrine of unclean hands is the obstacle to the proponent's recovery. (*Allstead* v. *Laumeister,* 16 Cal. App. 59 [116 Pac. 296].) However, when we consider that the trial court had no opportunity in the instant case to pass on that defense as it was not pleaded or called to its attention,

we must conclude that it is not now available to appellants. There are other circumstances also to be considered which force us to the conclusion that appellants should not prevail on this appeal. Commencing with the first contact between Poore and Watson it appears that the latter placed complete confidence and faith in Poore's honesty and advice. Watson placed the entire matter of his troubles in Poore's hands. Indeed, it might be well said that Watson made Poore his agent to conduct his affairs in relation to his difficulties and that their relationship was fiduciary in character. It was Poore who first suggested that Watson give a mortgage on the property in order that Kallmeyer and Lefflers could not reach it, and that he should not deal with Kallmeyer because the latter was not to be trusted. In this connection Watson testified that Poore told him: "I wouldn't trust Kallmeyer with my money. Jack what about my buying it for you in my name? I will use you right. When the deal is over, pay me the $1,200, *plus a commission for putting the deal through,* and I will give you back your property." Poore initiated the scheme whereby the El Monte property of Watson's wife was transferred to him. Although that transfer was only as security for the $1,200 loan, Poore maintained it was an outright purchase. After the purchase was made by Poore, Watson was sued for divorce and at Poore's instigation he left the state to avoid being compelled to appear in court in the action; Poore was to contest the action and protect both his own and Watson's interests. Thereafter, Poore fraudulently induced Watson to execute deeds conveying the ten acres to him. Although these latter transactions were after the transaction in which Poore purchased the property in his name, it may well be said they were a part of the entire transaction which Poore conducted for Watson and in which he directed Watson's actions. Although Watson's conduct was far from exemplary, we do not believe that under these circumstances it can be said that Poore and Watson were equally at fault. In the case of *Birney* v. *Birney,* 217 Cal. 353, 359 [18 Pac. (2d) 672], this court said:

"As was said in *Chamberlain* v. *Chamberlain,* 7 Cal. App. 634 [95 Pac. 659], one cannot lay a trap for another, secure his confidence, induce him to make a conveyance of his property in expectation that it will be returned, and thereafter retain the fruits of his perfidy on the ground that the donor too readily yielded to temptation to save himself at the pos-

sible expense of his creditors. The greater offense of the tempter overshadows and renders innocuous the weakness of the one of whom advantage is taken. Though a deed made for an improper purpose is unfairly procured through the undue influence of the grantee, in violation of a fiduciary relationship, abuse of confidence, oppression or fraud, a court of equity will still grant relief to one in fault. Such relief will not be denied to a party least in fault against one who has led him into the act by a violation of confidence. They are not in equal wrong. (*Anderson* v. *Nelson,* 83 Cal. App. 1 [256 Pac. 294].) Under the circumstances plaintiff should not be denied the relief he seeks.''

 Also as opposed to appellants' contention of unclean hands, particularly with relation to Watson's conduct toward his wife and the Lefflers, it may be pointed out that according to Watson's testimony he was not endeavoring to defraud the Lefflers but rather maintained in his discussions with Poore that the latter should settle with the Lefflers and see that they received the two acres they had agreed to purchase under contract with Watson. In respect to the claim that Watson was endeavoring to defraud his wife, the finding in the action of *Watson* v. *Watson* was that he and Poore had defrauded her of the El Monte City property, by having her convey it to Poore rather than the ten acres involved in these actions. It will be remembered that the El Monte City property was conveyed to Poore as security for the $1,200 loan, to be used by Watson and Kallmeyer to purchase the property from the Warren estate. Ordinarily improper conduct not necessarily connected with the transaction particularly involved (having Poore take the ten acres in his name), is not a reason for denying equitable relief on the ground of unclean hands.

 With respect to the deeds from Watson to Poore of the ten acres and the release which were executed after the entry of the judgment in the divorce action of *Watson* v. *Watson,* the court found that there was no delivery thereof and that they were executed upon the fraudulent representation of Poore to Watson that their execution was necessary for Watson to clear up his wife's end of the divorce action, and that Watson had no intention to convey the property to Poore. The documents were signed at the office of Watson's attorney in the divorce action where Poore took Watson advising the latter that he must sign some papers to settle the divorce

action insofar as Watson and his wife were concerned; the relations between Watson and his attorney were at that time unfriendly. In that connection Watson testified:

"A. He (Poore) came into the shack, (that was just prior to the trip to the attorney's office to sign the instruments) he says, — — 'Jack, the attorneys have been looking for you for three days'; I said, 'He knows where I live here, I have no reason to run around to see him any more, because I have to work for a living,' and he says, 'He has some papers for you to sign'; I says, 'I don't have to sign any papers, the clerk of the court signed all the papers necessary while I was away'; he says, 'This is in connection with the final settling up of the *Watson* vs. *Watson* case and your attorney says you will have to sign those papers because the appealing the case costing too much money, and I have decided to settle with Mr.' — — my wife's lawyer at that time — — 'Dadmun,' he says, 'My attorney, Mr. Coblentz, has got a $2,000.00 check *but he will not turn it over until you sign certain papers which cleans the thing up on your end of the line*'. . . .

"Q. Was there anything said in that conversation with relation to the El Monte City property? A. Yes, I said, 'What about my city property? You promised you would give that back to me,' and he says, 'I would, but my wife has it now, it is a clean sale, you lost it, and there is nothing to do about it.' I said, what about the settlement of the lion farm property (the ten acre tract)? . . . THE WITNESS: He looked at me in a kind of a funny way, and he said, 'Jack, you can't prove nothing in court. That land is mine, and I am going to keep it.' Q. At the time the deeds just shown you, Exhibits V, X and Y, and the release W were executed and signed by you, you had a conversation with Mr. Poore in which he stated to you that he would not pay $2,000.00 in settlement of the *Watson* vs. *Watson* divorce action, pay $2,000.00 to Mrs. Watson, unless you signed these instruments; is that correct? A. *No,* made no such statement. Q. Did he at the time that you executed the instrument which is referred to by myself, say anything to you about payment of $2,000.00? A. He said that he decided that he wouldn't appeal the case, because it cost too much money and he did decide and he had handed to his attorney a $2,000.00 check, and that his attorney wouldn't pass it to my wife's attorney until certain papers had been signed by me *to close up my* wife's end of the deal. He said nothing about anything else. . . . A. He did not.

*He said my wife wanted certain papers to clean up her end of the Watson* vs. *Watson trial,* and they had to be signed that night in order for him to pass the money (the $2,000 settlement) to Dadmun the next day. . . . Q. And Mr. Haughton presented these three deeds and the release to you for signature; is that correct? A. He passed to me a bunch of papers. Q. Were they the same papers?

''A. I don't know those were the same papers I signed that you showed me here. They were in it, but I didn't know it.

''Q. Why didn't you know it? A. Because he says, 'Will you look over them, Jack'; 'I haven't got my glasses,' and I says, 'What are they, Mr. Haughton?' 'Why,' he says, 'the cleaning up of the *Watson* vs. *Watson* trial.' I says, 'I am supposed to not sign no papers, only the court supposed to sign all the papers against me, and I am just supposed to be coming home after everything is cleaned up'; 'You have to sign those papers for your wife's end of it'; I says, 'You are my attorney, and I don't know a thing about those papers. What is in them, I haven't got my glasses, I trust in your honesty, shall I sign those papers or shall I not?' 'You have to sign them and clean up your *wife's end of the deal'; I* said, 'All right, where shall I sign?' He stood up, turned them over, and I signed them; he turned them over, kept turning them over until they were all signed and I didn't know two words that was there in those papers, never saw them, depended wholly on his advice and honesty as my attorney.''

Obviously, the instruments were not cleaning up Mrs. Watson's ''end'' of the case. They were not affecting any of Watson's rights or obligations in respect to the divorce action. We believe there was sufficient evidence to support the finding on which the judgment setting aside the deeds and release was based.

▆▆ Appellants, however, advance several other objections to the action of the court in setting aside these instruments. They claim that there was no restoration or offer to restore to Poore of the consideration given for the execution of the same. Watson testified positively that no consideration was given for their execution. Appellants claim that part of the consideration consisted of the $2,000 paid to Mrs. Watson in settlement of the part of the judgment awarding some $2,500 to her against Poore, and the dismissal of the appeal Poore had taken from the judgment. Watson received nothing from Poore, therefore, there was nothing for him to restore. The

payment of the $2,000 was in discharge of Poore's judgment obligation to Mrs. Watson with which Watson had nothing to do and which was of no benefit to him. He still remained obligated under the judgment for attorney's fees, alimony and the other awards made against him. Nor can it be said that he received anything by the dismissal of the appeal. That dismissal in no way benefited him. On the contrary, it may well have been to his advantage to have the appeal prosecuted. In any event according to Watson's testimony Poore said he was dropping the appeal because it was too expensive. It appears to be quite obvious that as the result of Poore's conduct Watson was induced to sign documents which were entirely contrary to what they were represented to be and for the execution thereof he received nothing. Under such circumstances no restoration was necessary. The mere fact that the papers were signed in the presence of Watson's attorney in the divorce action does not alter the case.

Appellants further urge that Watson failed to plead fraud with respect to the execution of the instruments, and that he was guilty of laches in rescinding. It must be remembered that those documents were pleaded as defenses by appellants in answer to Watson's action to establish a resulting trust. Under such circumstances, there being no pleading such as a replication in this state, it was not necessary for Watson to plead the fraud. Where facts constituting fraud are relied upon in avoidance of a defense set up in the answer, they need not be pleaded in the complaint but may be proved in rebuttal of the defense without replication. (*Taylor* v. *Taylor,* 192 Cal. 71 [218 Pac. 756, 51 A. L. R. 1074].) Watson did file an affidavit denying the due execution of the papers as required by section 448 of the Code of Civil Procedure.

The deeds and release were claimed to have been executed on September 11, 1936, and Watson's action to establish the resulting trust was commenced on February 17, 1937. That period of time cannot be said to be sufficient to constitute laches on Watson's part in attacking those instruments.

Appellants contend that in any event it cannot be held that Watson, by reason of the resulting trust, is the sole owner of the ten acre tract, but has no more than a *pro tanto* interest in the property; that is, an interest based on the amount of money which he contributed toward the purchase price of the property, and that inasmuch as the note and trust

deed for the $5,500 balance after the down payment was made were executed and have been partly paid by them, Watson has no interest in the property except to the extent of the sum of $1,200 paid by him on the purchase price. ██ It cannot be doubted that a resulting trust may be established in a fractional interest in property where the one urging the trust pays only a portion of the purchase price (25 Cal. Jur. 189). ██ However, the question here would appear to be whether that rule is applicable. Appellants assert that according to Watson's testimony it was agreed that by the purchase of the ten acres by Poore, Watson was to receive three acres of the property; Poore was to settle with the Lefflers for the two acres they had contracted for and Poore was to have the remaining five acres. They rely for that contention in part upon the original arrangement in which Poore was to loan the $1,200 to Watson to join with Kallmeyer in the purchase of the property in a manner that Watson would obtain five acres and Kallmeyer five acres. However, as heretofore shown, that transaction was never consummated. After negotiations therefor had ceased, the arrangement was that Poore was to purchase the ten acres for Watson. Appellants further point out, however, that Watson also testified that he asked Poore after Poore had purchased the property if the latter was going to carry out the ''gentlemen's agreement'' and settle with Lefflers for $3,000, and that Poore said Watson could have the three acres to which Watson replied, ''Oh, boy, if I can have it, I am perfectly satisfied.'' On the other hand Watson also testified: ''Q. You were to get all of the 10-acre tract, is that right, or were you to get 3 acres of the 5 acres? A. I gave him the money to go and buy the whole darned cheese and we were to settle afterwards, but he didn't settle.'' Under these circumstances we are not inclined to disturb the finding of the trial court that the resulting trust embraced the entire property. The difficult question is, whether the part of the money payable under the note and trust deed given by Poore to the Warren estate, which has been paid, was in fact paid by Poore from money belonging to Watson either by reason of an arrangement that the note would be paid out of the income from the property, the wages Watson claimed Poore owed him, or moneys advanced and loaned by Poore to Watson. In that respect Watson testified in relating the conversation between him and Poore just prior to the purchase, that Poore said:

" . . . but I want to make the bid high enough so the Lefflers can't raise it, going to make the monthly payments (on the unpaid balance) $100.00 per month and if you haven't money enough to make those monthly payments I will have to take it out of the labor I owe you, and you will have to keep on working. I (Watson) says that is O. K. with me. . . . " Watson further testified regarding the same conversation:

"A. Make the first down payment, he (Poore) says, 'Dig up money enough to make the first down payment, because I am pretty near broke, give me money to make the first down payment, and then,' he says, 'after I sell the property I can use the rents off the property to make the monthly payments, if I fail on that there is more interest on the lion farm property now you are working for me, so it is O. K., Jack, I can make the payments, fine and dandy, and if I need any more I will take it out of the labor that I owe you'." It is not unreasonable to conclude from the evidence that all moneys to be paid on the note given the Warren estate were to be paid by Poore either as a credit against sums he owed to Watson, or from the income from the property, or from funds which were to be a loan from Poore to Watson, and that therefore the court properly found that the entire ten acres was impressed with a resulting trust in Watson's favor. ■ The fact that the purchase price paid for property in cases involving resulting trusts consists of money borrowed from the one in whom title is taken, or is derived from the income from the property and is in fact paid by the grantee, does not prevent the establishment of a resulting trust. Further, the grantee may advance him credit rather than a loan. (*O'Rourke* v. *Skellinger,* 169 Cal. 270 [146 Pac. 633] ; *Brown* v. *Spencer,* 163 Cal. 589 [126 Pac. 493] ; *White* v. *Costigan,* 138 Cal. 564 [72 Pac. 178] ; *Webb* v. *Vercoe,* 201 Cal. 754 [258 Pac. 1099, 54 A. L. R. 1200] ; American Law Institute, Restatement of the Law of Trusts, sec. 456.) ■ Of course, the plaintiff is prevented by the statute of frauds from asserting an arrangement whereby he is to repay the grantee for the sums advanced after the purchase is made. (*Lincoln* v. *Chamberlain,* 61 Cal. App. 399 [214 Pac. 1013].) The fact that the note and trust deed given to the Warren estate for the balance of the purchase price were executed by the Poores alone, does not alter the situation. The property was the primary security for the loan. However, where the purchase price is loaned by the grantee to the plaintiff to make the purchase

from which a resulting trust arises, the plaintiff is, of course, obligated to repay the grantee, and the latter holds the legal title as security for the loan. In the instant case the court found that Poore had paid out on behalf of Watson a total of $7,047, consisting of the $1,200 loan and interest thereon, expenditures on the property and payments on the note held by the Warren estate; that Poore received as income the total sum of $17,432, consisting of $12,000 from the sale of the El Monte City property, and $3,632 income therefrom, and $1,800 income from the ten acre tract. It is claimed by appellants and not denied by respondents that some of those figures find no support in the evidence, and in this connection appellants assert that they are entitled to have an accounting in order to arrive at the true status of the claims by Poore and Watson against each other. ▮ Although it is true as asserted by respondents that appellants did not raise the issue of an accounting in their pleadings, having maintained in their pleadings and throughout the trial that no resulting trust existed and that the release heretofore mentioned settled the affairs between the parties, we believe that an accounting should be had in order that the lower court may determine whether there are any sums still owing from Watson to Poore for which Poore would hold the legal title to the property as security. The evidence with respect to the state of the accounts between Watson and Poore is both vague and conflicting, and this court is neither inclined nor able to make a determination in respect thereto.

▮ Finally, in respect to the respondents Lefflers, appellants contend that there being no privity of contract between them, the judgment in the action of *Lefflers* v. *Poore*, declaring Leffler's contract with Watson to purchase two acres of the property in full force and effect cannot stand. They must concede, however, that if the judgment establishing the resulting trust stands, and we have determined that it should, then they have no more than a bare legal title, and that they hold the property only as security for moneys expended on behalf of Watson which have not been paid. Watson, the owner of the entire beneficial interest in the property, has not appealed and is not complaining of the requirement that he be required to perform his contract with the Lefflers. It is therefore immaterial whether there exists any privity of contract between

Poore and Lefflers or that a contract obligation rests on the former to convey to the latter.

In view of the conclusion which we have reached that under the rules of law applicable to the facts of the case as disclosed by the record and found by the trial court in the case of *Watson* v. *Poore, et al.,* L. A. No. 16,787, the portion of the judgment in that case determining that the ten acre tract of land is held in trust by appellants for respondent Watson must be affirmed, and it is so ordered. It likewise follows that the judgments in the actions entitled *Leffler, et al.* v. *Watson, et al.,* L. A. No. 16,788, and *Poore, et al.* v. *Prow & Leffler, et al.,* L. A. No. 16,789, declaring the contract of the Lefflers to purchase two acres of said tract to be in full force and effect, are affirmed. But the portion of the judgment in the case of *Watson* v. *Poore, et al.,* L. A. No. 16,787, purporting to determine the amount of the indebtedness against said ten acre tract which respondent Watson is required to assume and pay is reversed, and the trial court is directed to take such further proceedings as may be necessary to determine the amount of any indebtedness which may exist between appellants and respondent Watson and enter judgment accordingly. In the event the trial court determines that respondent Watson is indebted to appellants in any sum whatever arising out of the transaction for the purchase of said ten acre tract, such indebtedness shall be a lien upon said tract. In all other respects the judgments are and each of them is affirmed. Respondents Lefflers to recover their costs of appeal. Neither appellants nor respondent Watson shall recover costs against the other on this appeal.

Gibson, C. J., Shenk, J., Curtis, J., Edmonds, J., and Traynor, J., concurred.