[Civ. No. 15205.   First Dist., Div. One.   Aug. 18, 1952.]

LOUISE STONE, Respondent, v. ETHEL LOBSIEN,
Appellant.

752

Mancuso, Herron & Winn and John Wynne Herron for Appellant.

David E. Peckinpah, Denver C. Peckinpah and L. N. Barber for Respondent.

PETERS, P. J.—Plaintiff, Louise Stone, brought this action against defendant Ethel Lobsien, to have the title to certain real property quieted and to have it determined that defendant, the record title holder, holds such title in trust for plaintiff. The trial court found that there was a resulting trust, and entered its judgment accordingly. Defendant appeals.

At the time of the events here involved, the plaintiff, her husband, and the defendant, were close friends. All three were members of the Seventh Day Adventist Church, Mr. Stone being a minister in that faith, and the two women being teachers in a church school. In 1935 Mr. Stone became blind, and thereafter was on blind relief. Plaintiff continued to teach, apparently as a substitute, but by 1940 she was on the W.P.A. rolls. They lived in rented premises.

Defendant, who was a widow, testified that prior to 1940 she had loaned the plaintiff and her husband several sums of money variously estimated by her as totaling $300, $400, or $500. This was denied by plaintiff.

The property involved herein is a small home on Roosevelt Way in San Francisco. This house is located on the street in back of defendant's residence. On the morning of December 1, 1940, defendant's daughter, then about 21 (defendant was out of town that day and for several days thereafter), telephoned to plaintiff and told her that the Roosevelt Way property was for sale, and suggested that plaintiff and her husband "could either buy or maybe rent

it.'' The daughter offered to come over and drive them to see the property. This she did, and then she drove them to the real estate office handling the property—Doelger's Judah Street office—and left them there. Plaintiff and her husband then talked to the real estate agent and gave him a $5.00 deposit. They were told that the total purchase price was $1,955, that $255 had to be paid as a down payment, and the balance secured by a note and deed of trust calling for payments of $17.50 per month. On the same or the next day a contract of sale naming the Stones as purchasers and Doelger as seller was drafted and delivered. . This contract recites the receipt of the $5.00 deposit and requires a further down payment of $250.

At one of these conferences the real estate agent suggested that, because both of the Stones were on relief, the seller would like some other person who would be additional security on the note. The daughter of defendant suggested that her mother might be willing to sign, and volunteered to write to her and secure her consent. Such consent was given. Thereupon, the Stones advised the real estate man to name defendant as grantee in the deed and as maker of the note. This was done, and defendant, on December 13, 1940, signed the deed of trust and the installment note. The deed, naming defendant as grantee, was delivered to the Stones. Admittedly the Stones paid the $250 additional down payment, title and other conveyance charges.

The defendant denied most of this testimony. While she admitted that the Stones paid the $255 down payment, she claimed that this was done as partial payment on the debt they owed her. The trial court has found that no such debt existed, and such finding is supported. Defendant also testified that before leaving town just before December 1, 1940, she told her daughter to purchase the property, and requested Mr. Stone to help her if she had any difficulties. She further testified that up to the trial she did not know who conducted the negotiations, and did not know the amount of the down payment. This testimony was not believed by the trial court. It is interesting to note that, although defendant's daughter was called as a witness for defendant, she was not asked one word about the transactions of 1940.

It is admitted that, immediately after the purchase transaction was completed, the Stones moved into the house. Thereafter, the Stones made all of the installment payments and paid the insurance, taxes, and for all repairs. Defendant

claims that this was done pursuant to an agreement she had with Mr. Stone that such payments should constitute rent. This was denied by plaintiff. This conflict, too, has been resolved against defendant by the trial court.

Late in 1949, Mr. Stone died and was buried at Reedley, California, where Mrs. Stone went and stayed several weeks. Before leaving San Francisco she left the key to the premises with defendant. A few days after her return she discovered that a strong box in the house had been opened and all the papers in reference to the house removed. She asked defendant about the papers and was told that defendant had taken them because they were needed in a dispute with the telephone company. Defendant refused to return the papers, and this litigation followed. Plaintiff testified that among the papers taken was an executed deed from defendant to the Stones which had not been recorded. Defendant denied the existence of such deed, claiming that the only deed taken was the deed from Doelger to her. Plaintiff alone testified as to the existence of this deed, and the trial court made no finding in reference to it. The judgment is not based on the existence of any such deed.

On this evidence the trial court found that the Stones and Doelger entered into the contract of sale; that it was orally agreed between the defendant and the Stones that the Stones should make the down payment, and that title should be taken in the name of defendant who agreed to sign the note and deed of trust; that the Stones agreed to make all payments; that defendant agreed to hold the title in trust for the Stones and to reconvey to them upon request; that the documents were so executed; that the Stones took possession and made the installment, insurance, tax and repair payments; that the Stones requested a reconveyance but defendant refused to convey. The court adjudged that defendant held title in trust for Mrs. Stone and ordered the property reconveyed to her.

The contention that the findings are unsupported is without merit. The evidence, although conflicting, supports the findings that title was taken in the name of appellant, that the down payment and the installments were paid by the respondent and her husband, and that there was an understanding that appellant was to hold the legal title as a convenience for, and in trust for, respondent and her husband.

One of the major contentions of appellant is that no resulting trust arose because the evidence shows that the

payments by respondent and her husband were made after the conveyance to appellant. It is claimed that, even according to respondent's testimony, appellant loaned her credit to respondent by signing the note and deed of trust. It is urged that, as a matter of law, payments made after the conveyance in satisfaction of such loan of credit cannot give rise to a resulting trust. In support of this contention the old cases of *Woodside* v. *Hewel,* 109 Cal. 481 [42 P. 152], and *Lincoln* v. *Chamberlain,* 61 Cal.App. 399 [214 P. 1013], are cited, as well as the more recent cases of *Bradley* v. *Duty,* 73 Cal.App.2d 522 [166 P.2d 914], and *McQuin* v. *Rice,* 88 Cal.App.2d 914 [199 P.2d 742]. If it be assumed that appellant did lend her credit in this transaction, a point that is very doubtful, and if the cases cited require contemporaneous payment, such cases no longer represent the law of California. The problem was recently reviewed by the Supreme Court in *Viner* v. *Untrecht,* 26 Cal.2d 261 [158 P.2d 3] (see, also, *Watson* v. *Poore,* 18 Cal.2d 302 [115 P.2d 478]), where the Supreme Court expressly disapproved the rule of the Lincoln case that a contemporaneous payment of money by the claimant must be shown, and held to the contrary. The later appellate court cases cited rely upon the disapproved rule of the Lincoln case. For this reason it must be held that the rule requiring contemporaneous payment is no longer the law of this state.

Appellant points out that she assumed liability on the deed of trust and note, and urges that there is no evidence of a promise on the part of respondent or her husband to pay the installments on the note. She claims that such an agreement is indispensable to a resulting trust. It is true that there is no specific evidence of a promise by respondent or her husband to make the installment payments. ▌ It is no doubt the law that when the transferee loans the purchase price to the claimant, that, before a resulting trust will arise, there must be evidence of an obligation by the claimant to repay the loan. (*Fuschi* v. *Vir Den,* 107 Cal.App.2d 280 [236 P.2d 829]; *Neusted* v. *Skernswell,* 69 Cal.App.2d 361 [159 P.2d 49]; *Mazzera* v. *Wolf,* 30 Cal.2d 531 [183 P.2d 649].) Perhaps that same rule applies where the transferee does not lend money, but lends credit. ▌ But, in the instant case, a promise on the part of the Stones to make the installment payments is necessarily implied from the very nature of the transaction, and by the evidence of what the parties did after the conveyance was made. Here the

claimant—respondent—made the down payment. The transferee—appellant—did not pay out one cent. Thereafter, the payments were made by respondent and her husband. This evidence, when considered in connection with the evidence that appellant agreed to hold title simply as a convenience to respondent and her husband, raised an implied promise on the part of respondent to make the installment payments.

Moreover, in the instant case, a promise by respondent to appellant to pay off the transferee's liability on the note and deed of trust would be of very little legal significance. ▆ The documents signed by appellant—the note and deed of trust—imposed no personal liability on appellant. This was a purchase money deed of trust, and, in this state, there is no personal liability imposed on the vendee of a purchase money deed of trust. In the event of a default, no deficiency judgment could have been taken against appellant. (Code Civ. Proc., § 580b; *Winklemen* v. *Sides,* 31 Cal.App.2d 387 [88 P.2d 147].) In *Brown* v. *Volz,* 90 Cal.App.2d 793 [204 P.2d 110], and in *Harper* v. *Heizer,* 103 Cal.App.2d 388 [229 P.2d 828], it was held that no detriment attaches to a party who signs a purchase money deed of trust. This being so, it is apparent that appellant did not lend her credit at all in this transaction. As thus analyzed, the transaction is simply the case of one person paying the consideration and another taking title, the most elementary and simplest type of a resulting trust.

Appellant places considerable reliance on the case of *Fuschi* v. *Vir Den,* 107 Cal.App.2d 280 [236 P.2d 829], a case factually quite similar to the instant one. In that case, however, there was evidence, believed by the trial court, that the down payment was made on behalf of the transferee, that the payments made by the claimant were rent, and that no promise to repay the transferee was ever made by the claimant. The appellate court simply sustained findings that there was no resulting trust. In the instant case the trial court believed the contrary evidence. The two cases are not inconsistent.

▆ The next contentions of appellant are that respondent has come into court with unclean hands, and that the transaction was illegal. These contentions are based upon certain evidence given by respondent on cross-examination. She there testified that the transaction was handled as it was for two reasons, one, that the seller wanted further security, and second, that she and her husband were doubtful, both being on relief, if they could own real property

without violating welfare regulations. The exact testimony is as follows: "When the papers were drawn up, that was the—there was the two reasons, that they wanted—Mr. Brackett wanted a signer for it; was one, that our financial backing wasn't good for a long term lease; and the other one, they informed me that being—my husband being on the blind pension, and I on the WPA, that we couldn't—that we would have her for a co-signer, and then we would take it as rent, and give it in to the Welfare as rent, until—being we didn't own the place, until it was paid for, that we would consider it as rent. And so that was the way it was handed in, as rent."

Respondent further stated that on the welfare forms they put down the payments as rent, because the property did not belong to them, it being their intent, when the property was paid for, to list it as their property. In response to a question as to whether they had represented to the welfare investigator that they were renting the property respondent answered: "We put it in that we were renting, on the basis we didn't own the property until we had it paid for, and we was holding the deed that we could file at any time we wished to file it. And so it was put in as we were paying rent." Respondent admitted that she and her husband reported to the welfare officials that they were paying monthly rent of $30, but she also testified that she thought the investigator knew that they were making the monthly installment payments on the property and were paying the other expenses, which roughly totalled about $30 per month. Certainly the welfare office knew that the Stones were making the payments and paying all expenses and repairs on the property because appellant conceded she so informed the welfare people of these facts by letter.

The appellant claims that this evidence demonstrates, as a matter of law, that the Stones entered into the deal with the intent of misleading the welfare department. Based on this premise it is then urged that this demonstrates that the Stones have unclean hands, which, so it is contended, deprived the trial court of power to grant any equitable relief. It should be here noted that the welfare department was not, in fact, defrauded. There is no law prohibiting recipients of relief from owning real property of the value of $1,995, less encumbrances.

It is probably the law that the unclean hands doctrine will bar a party from relief in equity where there is a mere

intent to defraud without actual fraud resulting. (*Tognazzi* v. *Wilhelm*, 6 Cal.2d 123 [56 P.2d 1227]; *Allstead* v. *Laumeister*, 16 Cal.App. 59 [116 P. 296]; *Belling* v. *Croter*, 57 Cal.App.2d 296 [134 P.2d 532].) But that rule applies as a matter of law only where the evidence is susceptible of but the one inference that the transaction was entered into with the intent to defraud. It is quite apparent that this transaction was entered into primarily at the suggestion of the seller in order to give the seller what he thought was better security. So far as the welfare department was concerned, all it was interested in was the amount of money spent and not whether the Stones had legal or equitable title to the property. The evidence, although ambiguous and somewhat conflicting, is susceptible of the interpretation that the welfare people knew that the Stones were buying the place, and certainly knew how the payments were being made. In support of the trial court we must construe the evidence most favorably to respondent. So construed, there was no intent to defraud.

Moreover, unclean hands was not pleaded by appellant nor was it made an issue at the trial. This defense must be raised in the trial court to be available. (*Watson* v. *Poore*, 18 Cal.2d 302 [115 P.2d 478]; *Scannell* v. *Murphy*, 82 Cal. App.2d 844 [187 P.2d 790].) Appellant does contend that she did raise the issue in her closing brief in the trial court, and did argue it on the motion for a new trial. It was within the discretion of the trial court to refuse to consider the issue at that late date.

Appellant also argues that the transaction constituted an illegal contract to defraud the welfare department, and correctly points out that illegality need not be pleaded nor raised in the trial court, but may be raised for the first time on appeal. (*Penn Mut. Life Ins. Co.* v. *Bank of America*, 5 Cal.2d 288 [54 P.2d 453]; *Dealey* v. *East San Mateo Land Co.*, 21 Cal.App. 39 [130 P. 1066]; *Morey* v. *Paladini*, 187 Cal. 727 [203 P. 760].) The complete answer to this contention is that, as already pointed out, the evidence supports the inference that the Stones had an innocent purpose, and did not enter into the contract with intent to defraud or mislead anyone.

Moreover, even if the Stones entered into the transaction because they believed, contrary to the fact, that under relief regulations they could not own real property, such belief would not render the contract illegal as a matter of law.

The case is not unlike *Svistunoff* v. *Svistunoff*, 94 Cal.App.2d 651 [211 P.2d 352]. There parents who wanted to come to the United States as emigrants transferred property to their son so that he could execute an affidavit that his parents would not become public charges. The boy then refused to reconvey. A resulting trust was decreed even though all concerned thought, incorrectly, that they were misleading the government, and such holding was affirmed on appeal. (See, also, *Solomon* v. *Walton*, 109 Cal.App.2d 381 [241 P.2d 49].)

Appellant also objects to the failure of the trial court to find expressly on her pleaded defenses of laches and estoppel. She pleaded that she was injured by respondent in not bringing the action until after the death of Mr. Stone so that he was unavailable as a witness, that the property has increased in value, and that she expended time, effort and money on the property. There was no substantial evidence to support these defenses. As to Mr. Stone's absence, appellant did not show she was injured—in fact, what evidence there is of his declarations demonstrates that he would have been adverse to her. There is no evidence at all of a change in value, or that appellant spent money or labor on the property. Thus, if findings had been made on these issues they would necessarily have been adverse. This being so, it was not error to fail to find on these issues.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied September 17, 1952, and appellant's petition for a hearing by the Supreme Court was denied October 16, 1952.