[Civ. No. 1005.    Fifth Dist.    Apr. 16, 1969.]

WALTER A. BEHM et al., Plaintiffs and Respondents, v. FIRESIDE THRIFT COMPANY, Defendant and Appellant.

16

Patrick, Buchanan & Phillips and Leslie S. Patrick for Defendant and Appellant.

Files & McMurchie, Files, McMurchie & Foley and Thomas T. Files for Plaintiffs and Respondents.

GARGANO, J.—This appeal involves a contest between two secured creditors of Cobb Garner Vaughn who are competing for the proceeds from the sale of mortgaged cattle. To avoid confusion, we shall hereafter refer to the appellant corporation as "Fireside," to respondent Walter A. Behm as "Behm," and to the debtor, Cobb Garner Vaughn, as "Vaughn."

The pertinent facts are these: In December 1961 Fireside loaned Vaughn $27,200 to purchase a dairy ranch and 68 head of cattle. Vaughn gave Fireside a deed of trust on the ranch and a chattel mortgage on the cattle as security for the loan. However, the ranch was initially owned by Behm and was purchased by Vaughn subject to a first deed of trust in favor of Behm. Moreover, at the time of the sale the 68 head of cattle were also mortgaged to Behm to secure a pre-existing promissory note in favor of Behm, but by a separate agreement with Vaughn, dated December 29, 1961, Behm agreed to

accept a new note and chattel mortgage from Vaughn in place of the pre-existing note and chattel mortgage and to subordinate the new chattel mortgage to the Fireside chattel mortgage. Thus, in January 1962 when the sale of the ranch and cattle to Vaughn was consummated, Behm held a superior deed of trust on the ranch, and Fireside held the superior chattel mortgage on the 68 head of cattle.

In October 1962 Fireside agreed to refinance Vaughn, who by then needed more money to operate the ranch. Behm agreed again to subordinate his pre-existing chattel mortgage to the new mortgage that Fireside required in order to make the loan. However, the subordination agreement which Behm signed was prepared by a title company on Fireside's behalf and was inaccurately drawn. It did not subordinate Behm's chattel mortgage to Fireside's chattel mortgage as the parties intended; it erroneously subordinated Behm's chattel mortgage to Fireside's second deed of trust on the ranch property. The result was that, contrary to the intention of both parties, Behm ended up holding the superior chattel mortgage of record.

In April 1964 Vaughn informed Fireside that he could no longer feed the mortgaged cattle and secured Fireside's consent to sell the cattle at public auction. A short time later (three days before the sale was to take place) Fireside notified Behm of the sale. Behm objected first on the ground that he held the superior chattel mortgage, and second, because the sale required his consent under Vaughn's agreement of December 29, 1961.[1] However, notwithstanding Behm's objection, Vaughn sold the mortgaged cattle at public auction on April 20, 1964. He then turned over all of the proceeds to Fireside to pay Fireside's loan. On the following day Vaughn also sold his milk contract with the Crystal Creamery and Butter Company for $17,000. This sale was made by Vaughn without Behm's consent, and Vaughn then used the proceeds

---

[1] The trial court's findings of fact mistakenly state that the agreement was entered into between Behm and Vaughn on December 29, 1962. However, the chronology of events recited in the findings clearly indicates that the agreement was signed December 29, 1961, as is stated therein. Moreover, in the brief Behm suggests that Vaughn's agreement not to sell or encumber the cattle or the milk contract without his consent was a condition to the subordination of the chattel mortgage to appellant's chattel mortgage and that appellant was a party to this agreement. However, although there is evidence in the record which would have supported a finding that Fireside had notice of this agreement, there is nothing in the record to indicate, nor did the court find, that Fireside was a party to the agreement.

to make a down payment on a home and to discharge certain personal debts and obligations.

On May 26, 1964, Behm brought this action in the court below to impress a trust against the proceeds derived from the sale of the mortgaged cattle.[2] Behm alleged in his complaint that his chattel mortgage was recorded prior to Fireside's chattel mortgage and was the superior mortgage. He also alleged that Vaughn fraudulently sold the mortgaged cattle without securing his consent, and then delivered the proceeds of the sale to Fireside under the mistaken belief that Fireside's chattel mortgage was the superior chattel mortgage. Fireside answered the complaint, alleging that Behm had agreed to subordinate his chattel mortgage to its chattel mortgage securing the new loan which Fireside made to Vaughn in October of 1962. Fireside further alleged that the subordination agreement which Behm signed was inaccurately prepared by the title company and, by way of affirmative defense, requested the court to reform the defective instrument by placing the Fireside chattel mortgage in the senior position and Behm's chattel mortgage in the junior position as the parties intended when the agreement was signed.

At the conclusion of the court trial the court found, in essence, that Behm had agreed to subordinate his chattel mortgage to the Fireside chattel mortgage to enable Vaughn to secure refinancing, but that the subordination agreement was inaccurately drawn by the title company; that Vaughn was not in default on the Fireside chattel mortgage when the cattle were sold, and no notice of default was given by Fireside; that the sale of the cattle by Vaughn was a voluntary sale without Behm's consent in violation of their agreement of December 29, 1961; that the sale was aided, abetted and encouraged by Fireside, and hence Fireside was "in no position to ask this court to invoke its equity powers to reform an abortive subordination agreement"; that Behm's chattel mortgage was recorded prior to the Fireside chattel mortgage and, absent a reformation of the defective subordination agreement, was superior to Fireside's chattel mortgage; that Behm was entitled to the proceeds derived from the sale of the mortgaged property to the extent of Behm's secured debt and Fireside held title thereto as an involuntary trustee for

[2]Behm's complaint which named Fireside and Vaughn as parties defendant, stated four separate causes of action. However, only one cause of action( the fourth) is pertinent to this appeal. The remaining causes of action were all against Vaughn, who has not appealed.

Behm's benefit. In short, the trial judge apparently believed that Behm agreed to subordinate his chattel mortgage to the new secured loan which Fireside made to Vaughn in October of 1962, but then refused to rectify the mistake which the title company made when it prepared the subordination agreement because he believed that he should not do so under the salutary maxim that "he who comes into equity must come with clean hands." Judgment was entered accordingly, and this appeal followed.

We agree with Behm's contention that there is substantial evidence to support the trial court's finding that Vaughn's sale of the mortgaged cattle was a voluntary sale of mortgaged property in violation of his agreement not to sell the cattle without Behm's consent. The agreement which Vaughn signed on December 29, 1961, contained the following pertinent provision: " 'Vaughn' does hereby further agree not to sell, transfer, encumber, lease, hypothecate and/or alienate any or all of the properties listed and encumbered by the Chattel Mortgage executed by them in favor of 'Behm' above described and/or the existing Milk Contract with the Crystal Creamery and Butter Company, without first obtaining the written consent of 'Behm', Nor Shall 'Vaughn', transfer, sell, or otherwise convey the real property encumbered by the Deed of Trust recorded August 10, 1961, in Book 4290 Page 558 of Official Records, without first obtaining the written consent of 'Behm'." And, significantly, Fireside had not declared a default on its mortgage nor had Fireside taken possession of the mortgaged cattle when the sale was held. Moreover, arguably, there is also substantial evidence to support the court's finding that Fireside aided and encouraged the sale; Fireside, with knowledge that Behm objected to the sale, notified the auctioner that it consented, and hence made it possible for the auction to proceed as scheduled. However, we nevertheless conclude that the trial judge erred when he relied on the "clean hands" doctrine to ignore Behm's agreement to subordinate his chattel mortgage to Fireside's chattel mortgage and declared that Behm held the superior chattel mortgage entitling Behm to a superior right to the proceeds of the cattle sale merely because that chattel mortgage was recorded prior in point of time.

First, Behm did not charge Fireside with fraud nor did he allege that Fireside aided, abetted and encouraged Vaughn to sell his mortgaged cattle. He merely alleged in his complaint, and later in his pretrial conference statement, that the pro-

ceeds of the sale were turned over to Fireside under the mistaken belief that Fireside held the superior chattel mortgage. And, significantly, when Behm prepared his pretrial statement he knew, by then, that Fireside was seeking reformation of the inaccurate subordination agreement which the title company prepared and which Behm signed. Moreover, there is nothing in the trial record to suggest that the applicability of the ''clean hands'' doctrine was urged by Behm at any time during trial. Thus, the court applied the doctrine without giving Fireside the opportunity to meet the issue. ■ It is settled that the ''clean hands'' doctrine must be raised in the trial court to be available as a defense (*Watson* v. *Poore*, 18 Cal.2d 302 [115 P.2d 478] ; *Marshall* v. *Marshall*, 232 Cal.App.2d 232 [42 Cal.Rptr. 686]). As was aptly stated in *Moriarty* v. *Carlson*, 184 Cal.App.2d 51, 57 [7 Cal.Rptr. 282] : ''It would be manifestly unfair to apply the rule [of unclean hands] unless the person against whom it is sought to be applied was apprised of the claim of 'unclean hands' and afforded the opportunity to present such evidence as might bear on that issue.'' ■ And, as the court reiterated in *Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists*, 227 Cal.App.2d 675, 726 [39 Cal.Rptr. 64] : ''. . . [I]t [unclean hands] must be pleaded or called to the attention of the trial court in order that it may pass on the defense and also to permit the person against whom it is sought to be applied the opportunity to present such evidence as might bear on that issue.''

■ Behm argues that a trial court may apply the ''clean hands'' doctrine even though it was not raised by the parties. However, the cases cited by Behm for this proposition are cases involving ''flagrantly unconscionable'' conduct in which the doctrine was applied to protect the court's integrity (see *Katz* v. *Karlsson*, 84 Cal.App.2d 469 [191 P.2d 541]). In the instant case Fireside's conduct can hardly be called ''flagrantly unconscionable'' nor can it be said that the trial court's integrity would have been compromised by granting the relief requested. According to the undisputed evidence, Fireside did not urge Vaughn to sell the mortgaged property. On the contrary, the plan to sell the cattle originated with Vaughn, and Fireside acquiesced only when Vaughn insisted he could no longer feed the cattle. Moreover, Fireside did not make the arrangements for the public auction nor did it actively participate in the sale. In reality Fireside believed itself the holder of the superior chattel mortgage and

merely consented to the sale because it also apparently believed that Vaughn could no longer feed the cattle and that the secured property was in jeopardy.

Second, the gravamen of Behm's lawsuit against Fireside as disclosed by the pleadings was that Behm's chattel mortgage was superior to Fireside's chattel mortgage because it was recorded first in point of time. Thus, Fireside had the right to defend itself by alleging and proving, as it did, that Behm agreed to subordinate his chattel mortgage to the Fireside chattel mortgage and that it was only mutual mistake which caused this failure to effectively subordinate. Moreover, Fireside was entitled to assert the legal defense of mutual mistake without seeking reformation of the defective subordination agreement (*Lestrade* v. *Barth,* 19 Cal. 660, 671; *Petersen* v. *Ridenour,* 135 Cal.App.2d 720 [287 P.2d 848]; *Tax Factors, Inc.* v. *County of Marin,* 20 Cal.App.2d 79 [66 P.2d 666]; *Siem* v. *Cooper,* 79 Cal.App. 748 [250 P. 1106]). Thus, the trial court could not deprive Fireside, who was brought to equity by Behm, of its legal defense nor could the court reverse the order of the priority of the chattel mortgages contrary to its own express finding. It is the rule in this state, as well as in our sister states, that the "clean hands" doctrine operates only against one who seeks active intervention of the court and should not be applied to a defendant who is not voluntarily seeking relief in equity but was merely brought there at the suit of another (*Omnibus Inv. Corp.* v. *Maag,* 188 Cal.App.2d 29, 32 [10 Cal.Rptr. 178]; 30 C.J.S., Equity, § 96, p. 1029). ▮▮▮ As the New Jersey Supreme Court succinctly stated in *Merchants Indem. Corp.* v. *Eggleston,* 37 N.J. 114 [179 A.2d 505, 514]: "Merchants misconceives the role of the 'clean hands' doctrine. It operates to deny a suitor the special remedies of equity, leaving him to his remedies at law. It does not deny legal rights, or foreclose a defense by a defendant brought into equity." ▮▮▮ Therefore, even assuming that the doctrine of "unclean hands" could have been properly applied to deny Fireside reformation in the first instance (if Fireside had brought the action), it could not be used to deprive Fireside of its right to raise the legal defense of mutual mistake.

▮▮▮ We turn to the other specific points made by Behm. He suggests that Fireside aided, abetted and encouraged the sale of the mortgaged cattle, and by accepting the proceeds from the sale converted Behm's security and was liable for the conversion. However, Behm's complaint did not allege a

conversion by Fireside, the case was not tried in the court below on this theory, and the court did not make the necessary findings to support a judgment on this basis. Moreover, the court impressed a trust in the amount of the full mortgage indebtedness on the proceeds derived from the sale, and this was not necessarily the proper remedy for the conversion of Behm's security. In short, for the conversion of his security Behm was entitled to the fair market value of the cattle on the date of the sale (not exceeding the mortgage indebtedness), less the amount due on the superior chattel mortgage, not necessarily to full payment of his secured indebtedness.

Behm argues that by consenting to the sale, Fireside made it possible for Vaughn to sell the milk contract separately and then to convert the proceeds from this sale to his own use. Succinctly, Behm asserts that if the cattle sale had taken place at a time when Vaughn could get a better contingent of buyers, and if the milk contract had been sold at the same time, there would have been sufficient proceeds from the sale of these assets to pay off both chattel mortgages. He therefore implies that he is entitled to full satisfaction of his secured note from the proceeds derived from the sale of the cattle for this, if for no other reason.

Arguably, Behm could have brought an action against Fireside in tort on the ground that the company induced Vaughn to breach his contract of December 29, 1961. However, Behm did not bring an action in the court below on this theory either, nor did the court make the necessary findings; the court did not even find that Fireside had actual knowledge of the contractual agreement in which Vaughn agreed not to sell the cattle or the milk contract without Behm's consent. Moreover, the court did not fix the damages according to this theory.

Behm's final thrust is that the court's refusal to reform the subordination agreement is justifiable on the ground that Fireside was negligent in failing to read the agreement before it was recorded or to discover the mistake for more than two years thereafter. He argues that this negligence was so gross that it precludes any relief under Civil Code sections 3399, 1577. (See *California Trust Co.* v. *Cohn,* 214 Cal. 619 [7 P.2d 297] ; *Metropolitan Loan Assn.* v. *Esche,* 75 Cal. 513 [17 P. 675] ; *Hawkins* v. *Hawkins,* 50 Cal. 558 ; *Roller* v. *California Pac. Title Ins. Co.,* 92 Cal.App.2d 149 [206 P.2d 694].) However, as is true of the other theories we have mentioned, Fireside's negligence was not urged in the

trial court, and the court made no findings on this issue. Thus, it cannot be urged for the first time on appeal.

The judgment is reversed.

Conley, P. J., and Stone, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied June 11, 1969.